## UNITED STATES *v.* GREATER BUFFALO PRESS, INC., ET AL.

No. 821.  Argued April 19, 1971—Decided June 1, 1971

DOUGLAS, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Friedman* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General McLaren, Samuel Huntington, Lee A. Rau,* and *Elliott H. Feldman.*

*Frank G. Raichle* argued the cause and filed a brief for appellees.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a civil antitrust case brought by the United States charging a violation of § 7 of the Clayton Act,[1]

---

[1] Section 7 provides in part:

"That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line

as amended, 64 Stat. 1125, 15 U. S. C. § 18. The main thrust of the case involves the acquisition by Greater Buffalo Press, Inc. (Greater Buffalo), of all the stock of International Color Printing Co. (International). The complaint, at the secondary level, charged that Greater Buffalo, Hearst Corp., through its unincorporated division King Features Syndicate (King), Newspaper Enterprise Association, Inc. (NEA), and others had conspired to restrain the sale to newspapers of the printing of comic supplements in violation of § 1 of the Sherman Act, as amended, 26 Stat. 209, 15 U. S. C. § 1. It also charged that Hearst and NEA were violators of certain tying arrangements involving the licensing of comic features and the sale of comic supplements.[2]

Before trial a consent decree was entered against Hearst, enjoining King from entering into any agreement limiting competition in the printing of color comic supplements and barring any tying arrangement.

After full trial the District Court dismissed the complaint.[3] The case came here under § 2 of the Expediting Act, as amended, 32 Stat. 823, 15 U. S. C. § 29. We noted probable jurisdiction, 400 U. S. 990. We reverse the judgment below.

The case involves the comic supplement business used weekends by most newspapers. Some papers print their own comic supplements; others purchase them.

Greater Buffalo prints color supplements for newspapers and sells them.

International prints color comic supplements for King only.

---

of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

[2] A monopolization charge against Greater Buffalo was eliminated by an amended complaint.

[3] The United States did not appeal from the dismissal against NEA.

Most color comic supplements are printed by companies like Greater Buffalo and sold to newspapers. But individual newspapers contract for the purchase of comic features and it is those comics that Greater Buffalo prints for the particular papers.

The most popular comic features used by major metropolitan papers are controlled by King.

Greater Buffalo has no control over the ownership of features and therefore does not license them. As noted, however, King is a licensor; and moreover, it prints "ready-print" supplements which are preprinted and supplied to many newspapers only with masthead change.

The District Court declared that the acquisition of International by Greater Buffalo has not, and will not, result in a substantial lessening of competition in the color comic supplement industry, and therefore did not constitute a violation of § 7 of the Clayton Act.

The basic error of the District Court, in our view, was in its finding that the significant lines of commerce involved in this action should be divided into "two distinct and separate categories: (1) the printing of color comic supplements for newspapers which do not print their own, and (2) the printing of color comic supplements for syndicates engaged in the sale of copyrighted comic features to newspapers. These are the lines of commerce—to treat them together as one line of commerce, i. e., the printing and sale of color comic supplements, would be to ignore the tremendous leverage of the syndicates which control the copyrighted features."

As we read the record, the printing of color comic supplements and their sale are component parts of the color comic supplement printing business. One firm or company may both print and sell; another may print yet sell through a third organization, as does International through King. The "area of effective competition,"

*Standard Oil Co.* v. *United States,* 337 U. S. 293, 299–300 n. 5, comprises the business of Greater Buffalo, International, and King. There may be submarkets within this broad market for antitrust purposes (*Brown Shoe Co.* v. *United States,* 370 U. S. 294, 325), but, as we said in *United States* v. *Phillipsburg National Bank,* 399 U. S. 350, 360, "submarkets are not a basis for the disregard of a broader line of commerce that has economic significance."

The District Court, proceeding from its premise as to the relevant market, analyzed the effects on the competition between Greater Buffalo and International resulting from the purchase of the stock of the latter. The true import would include not only that but also the effect on competition of the alliance with King, through the acquisition of King's client, International. The three of them were engaged in the single line of commerce consisting of the printing and distribution of color comic supplements. The printing of color comics is the same no matter for whom it is done or through whom they are distributed. The combination of those who print and sell comic supplements with those who sell comic supplements printed by others fastens more tightly the hold of the group on the side of supplement printing business. As a result of the acquisition, King has become dependent on Greater Buffalo for most of the printing which it sells in competition with Greater Buffalo. Greater Buffalo, it is said, had no long-term contract for King's business following the acquisition. Yet it had the almost certain right to print for King, its principal selling competitor, and a 10-year contract was entered into in the summer after the acquisition. There is evidence that Greater Buffalo has taken accounts from King since the acquisition. But existing competition between them is naturally restricted to sales at a price

higher than Greater Buffalo charges King for printing; and it is not that fuller competition that could exist if King had an independent printing source.

King's executive officer proposed, after the stock acquisition of International, that King acquire its own color supplement printing capacity.

> "Even if it cost money to do this and diminished profits, wouldn't that be better than the eventual loss of most, if not all, of our readyprint business?
>
> .            .            .            .            .
>
> "The Syndicate which for more than a quarter of a century has been number one in the readyprint field is now at best number two, and quite helpless. Newspaper history clearly emphasizes the difficulty, in fact hopelessness of regaining a lost position. There is plenty of current evidence to substantiate this.
>
> "If Koessler [head of Greater Buffalo], because of what he has done the past few years, were to be attacked, in my opinion he would lose, but there is the danger, I suppose, of our becoming an accessory. Here is another reason why I think that if we were in the readyprint field with plants of our own it would restore a competitive aspect and certainly that wouldn't be discouraged in Washington."

Prior to the acquisition, King put pressure on International to construct a southern plant to meet Greater Buffalo's proposed expansion there. Prior to the acquisition King also induced International to cut its price to meet competition and actually transferred a few contracts from International to Greater Buffalo because of prices.

Those practices ceased after the acquisition. Greater Buffalo acquired control of about 75% of independent color comic supplement printing, leaving King no reliable alternative supply. Greater Buffalo and International

which had been competitors ceased to be such. The threat that newspaper customers will do their own printing is of course a factor in the competitive situation. But, according to the record, color comic supplement printing requires exacting mechanical techniques performed by specially trained personnel, and independent printers specializing in supplement printing and handling a high volume of business can produce a high quality product more economically than most newspapers.

The test of § 7 is whether the effect of an acquisition "may be substantially to lessen competition." The concentration of 75% of the independent color comic supplement printing business in one firm points firmly to the conclusion that the difficulties of new entrants becoming real competitors of Greater Buffalo are greatly increased.

We also disagree with the District Court that the acquisition of International by Greater Buffalo was within the "failing company" exception to § 7 of the Clayton Act.

That test is met only if two requirements are satisfied: (1) that the resources of International were "so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure . . . ," *International Shoe Co.* v. *Federal Trade Comm'n,* 280 U. S. 291, 302, and (2) that there was no other prospective purchaser for it. *Citizen Publishing Co.* v. *United States,* 394 U. S. 131, 138.

It is true that its owners wished to sell rather than raise the capital needed for modernization and expansion, and that King, its sole customer, was threatening to place some of its business elsewhere. Yet King had not threatened to invoke, nor had it invoked, the six-month cancellation provision in the contract. Its expansion plans were being actively pursued and it continued to pay dividends to its owners. Indeed in the year of the sale it had shown a substantial increase in profits.

Moreover, only King and Greater Buffalo were considered as prospective purchasers; the numerous other smaller color comic supplement printers were never even approached.

Since the District Court found no violation of § 7, it naturally did not reach the question of remedy though it said that if there were a violation, it would not warrant "a court's exercising its discretion to order a divestiture fifteen years after the occurrence of the alleged illegal conduct." That is not the law; the passage of time *per se* is no barrier to divestiture of stock illegally acquired. *United States* v. *Du Pont,* 353 U. S. 586, 590; 366 U. S. 316. Divestiture performs several functions, the foremost being the liquidation of the illegally acquired market power. *Schine Chain Theatres* v. *United States,* 334 U. S. 110, 127–129.

We do not, however, reach the question of divestiture. A majority of the Court is of the view that the nature of the decree to be fashioned should be initially considered by the District Court. In that connection two additional questions will need to be passed on by the District Court.

*First* is the question of the consent decree entered with Hearst. As to it the District Court said: "King Features may continue to engage in the practice of combining the sale of features and printing until the court shall determine the antitrust issue as to Greater Buffalo. The decree also provided that Hearst shall obey the antitrust laws during the pendency of the action."

We do not have enough information about the consent decree and its operation and the related facts to know how it should now be integrated into a decree.

*Second.* In the fifties Greater Buffalo erected a printing plant at Lufkin, Texas, to improve its market in that area by saving transportation costs. There is some evidence that in 1950 Greater Buffalo made a moral commitment to certain newspapers to build a plant in the

Deep South. A plant was constructed at Sylacauga, Alabama, after the acquisition of International.

There are cross-currents in the record which suggest that the Sylacauga plant was the product of International's wishes, rather than Greater Buffalo's, and that the primary motive for Greater Buffalo's acquisition of International stock was to eliminate International's planned expansion in the South as a competitive threat.

The status of the Sylacauga plant is a matter to be considered by the District Court under the controlling precedents. See, e. g., United States v. Aluminum Co. of America, 247 F. Supp. 308, aff'd, 382 U. S. 12.

The judgment is reversed and the cause remanded for the drafting of a decree and the making of such additional findings both as respects the consent decree and the Sylacauga plant as may be appropriate or necessary for an effective remedy.

*Reversed and remanded.*