577 F.2d 1368
 1978-1 Trade Cases 62,087
 ASH GROVE CEMENT COMPANY, Petitioner,
v.
FEDERAL TRADE COMMISSION, Respondent.
 No. 75-3143.
 United States Court of Appeals,
Ninth Circuit.
 May 23, 1978.
Rehearing and Rehearing En Banc Denied July 13, 1978.
 
 David J. McKean (argued), Washington, D. C., for petitioner.
 Jerold D. Cummins (argued), Washington, D. C., for respondent.
 On Petition to Review an Order of the Federal Trade Commission.
 Before CARTER and HUG, Circuit Judges, and HAUK,* District Judge.
 JAMES M. CARTER, Circuit Judge:
 
 
 1
 This is a petition by Ash Grove Cement Company to review an order of divestiture and a cease and desist order issued by the Federal Trade Commission (FTC or Commission). The Commission issued the orders after adjudicating that Ash Grove had violated § 7 of the Clayton Act by its acquisition of two ready-mix concrete companies. Ash Grove raises three contentions: (1) all of the material issues in the adjudicative proceedings were prejudged against Ash Grove in unlawful non-adjudicative agency proceedings; (2) the evidence does not support the Commission's finding that Ash Grove's acquisitions caused a lessening of competition; and (3) it was error for the Commission to order divestiture in the facts of this case. We AFFIRM.
 
 
 2
 I. FACTS.
 
 
 3
 Ash Grove is a major supplier and manufacturer of portland cement (hereafter "portland") which is the major and most expensive ingredient of ready-mix cement (hereafter "ready-mix"). Between 1961 and 1966 Ash Grove sold an average of about 400,000 barrels of portland annually in the Kansas City Metropolitan Area (KCMA). This amounted to between 13% and 18% of the total annual sales of portland in the KCMA. Most portland was sold to manufacturers of ready-mix.
 
 
 4
 On June 1, 1964, Ash Grove purchased 50% of the stock of Fordyce Concrete, a ready-mix manufacturer engaged in business in the KCMA since 1961. About two and one-half years later, on November 8, 1966, Ash Grove purchased the outstanding 50% of Fordyce stock, thereby obtaining 100% ownership. At that time Fordyce was the third largest ready-mix company in the KCMA, producing 14% of the local output. It was the largest independent ready-mix manufacturer; the two larger firms already had been acquired by other portland manufacturers.
 
 
 5
 In the early 1960's Ash Grove also acquired one third of the stock of Lee's Summit, another ready-mix manufacturer in the KCMA. On January 6, 1966, Ash Grove purchased the remaining two-thirds of the Lee's Summit stock. At that time Lee's was the seventh largest KCMA ready-mixer, with 4.3% of the total local output. In effect Ash Grove, through these two acquisitions, had acquired customer firms which, combined, represented nearly one-fifth of the KCMA ready-mix industry. The assets of Lee's were subsequently transferred to Fordyce through liquidation and the two companies were operated as one under the name "Fordyce-Summit".
 
 
 6
 At about the same time that Ash Grove was in the process of acquiring Fordyce and Lee's, the Federal Trade Commission conducted an investigation of the problem of vertical integration in the cement industry. In April, 1964, the FTC announced that due to the "growing importance and urgency" of the industry-wide trend toward integration of the cement industry, it would institute a trade regulation rule proceeding to organize and appraise "the general economic facts involving (the cement) industry and market structure . . ." Permanente Cement Co., 65 F.T.C. 410, 494 (1964). On December 1, 1964, the Commission issued a minute order directing its Bureau of Economics to conduct the inquiry,
 
 
 7
 " . . . to obtain information concerning such matters as the structure of the cement-producing and principal cement-consuming markets, the nature of the relevant product and geographic markets, the causes and business reasons underlying such acquisition and the probable effects of such acquisitions on competitive conditions of the market and industries involved which may be of assistance to the Commission in discharging its responsibilities to enforce the laws, in particular Section 7 of the Clayton Act, applicable to such acquisitions." See FTC Economic Report on Mergers and Vertical Integration in the Cement Industry at v (1966). (Emphasis added.)
 
 
 8
 After nearly two years of study the Bureau of Economics on April 4, 1966, transmitted to the Commissioners the staff report entitled Economic Report on Mergers and Vertical Integration in the Cement Industry (hereafter "Economic Report"). The Economic Report analyzed twenty-two target metropolitan areas, including the KCMA, to determine the extent and anticompetitive effects of vertical integration in the cement industry. No trade regulation rule was ever issued.
 
 
 9
 The Economic Report was the subject of public hearings in June 1966. On January 3, 1967, the FTC, based on the report and the public hearings,[1] issued its Enforcement Policy with Respect to Vertical Mergers in the Cement Industry (hereafter "Enforcement Policy"). The Enforcement Policy concluded that vertical mergers in the cement industry, particularly those involving ready-mix companies, "can have substantial adverse effects on competition in the particular market areas where they occur." Id. at 2. Guidelines were promulgated to indicate which mergers the FTC would be likely to challenge. However, it was expressly stated that any enforcement proceedings would be judged on the basis of the facts presented in the individual adjudicative proceedings instituted.
 
 
 10
 On July 8, 1969, the FTC issued a complaint charging Ash Grove with violation of § 7 of the Clayton Act, as amended, 15 U.S.C. § 18, by its acquisitions of Fordyce and Lee's Summit.[2] Ash Grove admitted the acquisitions took place, but denied their illegality. Furthermore, Ash Grove claimed that its right to due process of law had been and would be further infringed because the major issues in the complaint allegedly had been prejudged by the FTC. A series of attempts by Ash Grove to have the complaint dismissed and to limit the proceedings were all unsuccessful. After extensive hearings[3] the administrative law judge found in his Initial Decision filed September 23, 1974, that the challenged acquisitions were in violation of § 7 of the Clayton Act.[4] A proposed order requiring divestiture was included with the decision.
 
 
 11
 On appeal the Commissioners entertained extensive briefing and oral argument, but ultimately issued an Opinion and Order on July 24, 1975, affirming the Initial Decision of the administrative law judge with modifications.[5]
 
 
 12
 The Commission's Order decreed that Ash Grove divest itself of all stock, assets and properties acquired as a result of the acquisitions of the stock of Fordyce and Lee's. Ash Grove filed a petition for reconsideration requesting that the remedy of divestiture be withdrawn. The petition was summarily denied and this petition for review followed.
 
 
 13
 II. DUE PROCESS OF LAW.
 
 
 14
 Ash Grove contends its constitutional right to due process of law was violated because the FTC's investigation of the cement industry and subsequent promulgation of the Economic Report and the Enforcement Policy (1) were without statutory authority, and (2) caused the Commission to prejudge all the material issues involved in the adjudicative proceeding instituted against Ash Grove.
 
 
 15
 The heart of Ash Grove's contention that the FTC acted without statutory authority is that the Commission was engaged in rulemaking when it investigated the cement industry and promulgated the Enforcement Policy. Allegedly the Enforcement Policy is a "per se rule of illegality". According to the argument, § 11(b) of the Clayton Act, which contains the statutory authority for the FTC to enforce § 7 of the Clayton Act, restricts the agency to enforcement solely by adjudicative procedures. Thus, Ash Grove maintains, the FTC was not statutorily authorized either to investigate the cement industry through a trade regulation rule proceeding or to issue a rule based thereon.
 
 
 16
 Ash Grove is mistaken both as to its allegation that the Enforcement Policy constitutes a "rule" and as to its contention that the FTC cannot conduct investigations in the form of trade regulation rule proceedings. First, neither the Economic Report nor the Enforcement Policy were issued as trade regulation rules. Trade regulation rules, once found applicable to a particular adjudicative issue, are binding on the parties involved. See 16 C.F.R. § 1.12(c). See also Gifford-Hill & Company, Inc. v. F.T.C., 389 F.Supp. 167, 175 (D.D.C.1974), aff'd, 173 U.S.App.D.C. 135, 523 F.2d 730 (1975). Here the investigation was conducted in the form of a trade regulation rule proceeding, ostensibly with the intention of establishing a rule if feasible.[6] However, no rule was promulgated. The FTC Division of Industry Analysis of the Bureau of Economics conducted the investigation and issued a staff report to the Commission. The Commission then held public hearings on the Economic Report to afford the public an opportunity to comment. Referring specifically to the Economic Report the Commission assured that it constituted nothing more than a staff document which the Commission "has not approved, disapproved, or passed upon".[7] 31 Fed.Reg. 6285 (1966).
 
 
 17
 After the hearing on the Economic Report was held, at which Ash Grove submitted comment, the Commission issued its Enforcement Policy. This document also was not issued as a rule, but as an industry guide. Although the Commission specified in the Enforcement Policy generally which mergers and acquisitions it intends to challenge, specific care was taken to explain that the document was not binding on any party:
 
 
 18
 "In view of its extensive activity in the application of Section 7 to forestall anticompetitive mergers, together with its understanding of prospective developments in cement manufacture and distribution, this Commission wishes to make abundantly clear insofar as possible, its future enforcement policy with regard to vertical mergers in the cement and ready-mixed concrete industries. In doing so it is expected that needless litigation may be forestalled. At the same time however it should be noted that the issues in any proceeding instituted by the Commission will be decided on the merits of that case." Enforcement Policy at 8-9. (Emphasis added.)
 
 
 19
 In subsequent proceedings against various cement producers (including Ash Grove) the Commission has repeatedly reiterated that its hearing examiners as well as the Commission itself are not bound by any of the conclusions in the Enforcement Policy and must base their decisions on the record of the individual enforcement proceedings at issue.[8]
 
 
 20
 The Enforcement Policy was created and published to increase the expertise of the Commission and to provide guidance for agency staff and industry members plus their counsel regarding the enforcement intention of the FTC with respect to the cement industry. As such it is not a trade regulation rule.
 
 
 21
 Second, Ash Grove is incorrect that the Commission was without authority to conduct investigations through the medium of a trade regulation rule proceeding and utilize the expertise and information obtained thereby in subsequent adjudicative enforcement proceedings.[9] The FTC is authorized to enforce § 7 of the Clayton Act by § 11(b) of the same act which provides in relevant part:
 
 
 22
 "Whenever the Commission * * * shall have reason to believe that any person is violating or has violated any of the provisions of sections 2, 3, 7 and 8 of this Act, it shall issue and serve upon such person and the Attorney General a complaint stating its charges in that respect, and containing a notice of a hearing * * *
 
 
 23
 "If upon such hearing the Commission * * * shall be of the opinion that any of the provisions of said sections have been or are being violated, it shall . . . state its findings as to the facts, and shall issue and cause to be served on such person an order requiring such person to cease and desist from such violations * * *."
 
 
 24
 Because this provision mentions only adjudication Ash Grove contends the FTC is prohibited from utilizing any supplemental procedures to facilitate its enforcement of the specified provisions of the Clayton Act. But while § 11(b) refers only to adjudication as the means of enforcing the statute against specific violators, it does not use any limiting language suggesting that adjudication is the only proper method of elaborating the statutory standard. Nor does it in any way suggest that evidence or argument produced as a result of non-adjudicative procedures is inadmissible in adjudicative hearings. It merely provides that once a specific offender has been identified and the decision has been made to proceed against the offender, the proper procedure is adjudication, i. e., complaint, hearing, and a cease and desist order if justified.
 
 
 25
 Moreover, the Commission has explicit statutory authority to conduct investigations of individuals, corporations or industries to assist its enforcement of the acts which it administers. Section 6(a) of the F.T.C. Act, 15 U.S.C. § 46(a), provides:
 
 
 26
 "The Commission shall also have power
 
 
 27
 "(a) To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any . . . corporation engaged in or whose business affects commerce * * * and its relation to other persons, partnerships, and corporations."
 
 
 28
 Information gathered by the Commission under its broad investigatory powers can be used for a variety of purposes, including promulgation of new rules, reporting to Congress, disseminating economic knowledge to the public, or, as here, to prepare an economic survey or report to enable the Commission to better administer the statutes over which it has jurisdiction. In addition, factual material compiled by the agency may call its attention to situations which warrant an adjudicative enforcement proceeding. "In such a case, all information gathered through the many factfinding activities of the agency may be used as evidence, even if it was originally obtained for the purpose of making an economic or statistical study." Von Kalinowski, Antitrust Laws and Trade Regulation § 86.01.
 
 
 29
 In reply Ash Grove appears to concede the authority of the FTC to investigate, but contends that investigations conducted through trade regulation rule proceedings are ultra vires.[10] We have found no authority for this novel proposition. Nothing in either the statute or the regulations prohibits the FTC from conducting investigations through authorized trade regulation rule proceedings. See 15 U.S.C. § 46(a); 16 C.F.R. §§ 1.5,1.6, 2.8. Once such proceedings are concluded the Commission can proceed to issue a trade regulation rule, can determine no rule is necessary and culminate its efforts, or, can simply issue a policy statement as an industry guide. See generally Von Kalinowski, Antitrust Laws and Trade Regulation § 83.03(2)(d). We hold that the FTC's investigation of the cement industry through the medium of a trade regulation rule proceeding and its subsequent promulgation of a staff report and an industry guide were fully authorized by law.
 
 
 30
 Ash's final due process argument is that even if legally permissible, the FTC's prior exposure to the issues involved in this case through its investigation caused it to unlawfully prejudge the adjudicative proceeding below. Claims that an administrative agency is impermissibly biased because of its combination of investigative and adjudicative functions must overcome a presumption of honesty and integrity on the part of the decisionmaker. In the recent case of Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 45 L.Ed.2d 712 (1975), the Supreme Court ruled:
 
 
 31
 "The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."
 
 
 32
 Ash Grove attempts to rebut this presumption by making a comparison between the complaint issued against it in 1969 and selected excerpts from the Report and the Enforcement Policy. The comparison shows that many of the facts reported by the staff in its Economic Report and some of the Commissioners' tentative conclusions reached in the Enforcement Policy were mirrored in the FTC complaint against Ash Grove. However, this does not show impermissible prejudgment. That facts revealed by the staff investigation subsequently formed a part of the foundation for an enforcement proceeding is to be expected. Indeed, one of the purposes of industry investigations is to provide the agency with increased expertise in administering the law by exposing it to the factual background of relevant industries against which to judge individual mergers and acquisitions.
 
 
 33
 Likewise, the fact that some of the Commissioners' conclusions expressed in the Enforcement Policy were mirrored in the complaint does not prove prejudgment.[11] The Enforcement Policy was openly cautious to phrase its conclusions tentatively. Even the portions used by Ash Grove in its point-by-point comparison show that the Commissioners expressly conceded the possibility that individual acquisitions or mergers might not violate the statutory standard. For example, the Enforcement Policy concludes: "The Federal Trade Commission has concluded that vertical mergers and acquisitions involving cement manufacturers and consumers of cement, particularly ready-mixed concrete companies, can have substantial adverse effects on competition in the particular market areas where they occur." Enforcement Policy at 2. (Emphasis supplied.)
 
 
 34
 Ash Grove maintains that the Commission cannot avoid the implication that it has unfairly prejudged all the material issues by self-serving statements that it will judge each case on its individual merits. However, we reiterate that the presumption favors the Commission and it is incumbent on Ash Grove to make a showing that undue prejudice did occur. The facts suggest otherwise. In its proceeding against Ash Grove the FTC did not rely solely or even primarily on the Economic Report or the Enforcement Policy to prove its case. Extensive independent evidence was introduced before the administrative law judge and was available upon review by the Commission.[12] In fact, reliance on the information and tentative conclusions reached in the Economic Report and Enforcement Policy alone could not support a finding of violation against Ash Grove. It was the burden of the FTC to make a specific showing with respect to the particular acquisitions subject to the complaint that they were likely to cause the proscribed effect. This showing was amply made.[13]
 
 
 35
 The issue here is not dissimilar to that in F. T. C. v. Cement Institute et al., 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). There the Commissioner charged and after hearing determined that the respondents' use of a multiple basing-point delivered-price system in the cement industry violated Section 5 of the F.T.C. Act and Section 2 of the Clayton Act. On judicial review one of the respondents contended it did not receive a fair hearing before the Commission since the Commission was biased against the portland cement industry generally. Respondent noted that the Commission had, prior to the filing of its complaint, conducted an investigation resulting in the conclusion that "the multiple basing point system as they had studied it was the equivalent of a price fixing restraint of trade in violation of the Sherman Act," and that the Commission had reported this conclusion to Congress and the President. The Supreme Court "decide(d) this contention (of prejudgment) . . . on the assumption that such an opinion (of the illegality of multiple basing-point delivered-price systems) had been formed by the entire membership of the Commission as a result of its prior official investigations." Id. 333 U.S. at 700, 68 S.Ct. at 803. The Court concluded, however, that the Commission had not so prejudged the issues as to impermissibly taint their action in the adjudicative proceeding. It was held not to be a denial of due process for the Commission to express an opinion on the legality of a particular trade practice and thereafter pass upon the lawfulness of the practice while sitting as judges during an adjudicatory proceeding:
 
 
 36
 ". . . (no) decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law. In fact, judges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court." Id. 333 U.S. at 702-03, 68 S.Ct. at 804.
 
 
 37
 Ash Grove has not overcome the presumption of fairness by the FTC in its adjudicative enforcement procedures.
 
 
 38
 III. SUFFICIENCY OF THE EVIDENCE.
 
 
 39
 Ash Grove next contends there has been an inadequate showing that its acquisition of Fordyce and Lee's Summit may substantially lessen competition in any section of the country. Section 7 of the Clayton Act provides:
 
 
 40
 "No corporation engaged in commerce shall acquire . . . the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation . . . where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."
 
 
 41
 The scope of our review of factual findings made by the FTC is very narrow. Section 5(c) of the F.T.C. Act, 15 U.S.C. § 45(c), mandates that "(t)he findings of the Commission as to the facts, if supported by the evidence, shall be conclusive." This statutory language has been judicially interpreted to confine the exercise of appellate review of agency fact-findings to a determination whether they are supported by substantial evidence. "Findings of fact cannot and will not be set aside if the evidence in the record reasonably supports the administrative conclusion, even though suggested alternative conclusions may be equally or even more reasonable and persuasive. The findings must stand unless they were wrong, and they cannot be wrong that is reversibly wrong if substantial evidence supports them." Colonial Stores Inc. v. F. T. C., 450 F.2d 733, 739-40 (5 Cir. 1971). See also Carter Products, Inc. v. F. T. C., 268 F.2d 461, 495 (9 Cir. 1959), cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959).
 
 
 42
 Ash Grove responds with a detailed cite to its own exhibits to show that in 1967-68 (the two years immediately following the acquisition) competition continued to exist in the portland and ready-mix industries in the KCMA notwithstanding its acquisition of Fordyce and Lee's Summit. But this evidence does not refute the Commission's findings for a variety of reasons.
 
 
 43
 Although Ash Grove is correct in maintaining the Commission has the burden of proving there was a reasonable probability that the disputed acquisitions would substantially lessen competition in the relevant product and geographic markets, U. S. v. E. I. duPont de Nemours & Co., 353 U.S. 586, 598, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), proof of an actual anticompetitive effect is not an essential ingredient of a Clayton Act § 7 violation. Section 7 was adopted to arrest anticompetitive effects of market concentration in their incipiency:[14]
 
 
 44
 "The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future. (Citations omitted.) The section can deal only with probabilities, not with certainties. (Citations omitted.) And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before Section 7 can be called into play. If the enforcement of Section 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." F. T. C. v. Procter & Gamble Co., 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967).
 
 
 45
 It is for this reason that the Supreme Court has held post-acquisition evidence of the type urged on us by Ash Grove to be entitled to only "extremely limited" weight in tending to refute the anticompetitive probabilities of acquisitions challenged under § 7. The Court recently stated:
 
 
 46
 "In F. T. C. v. Consolidated Foods Corp., 380 U.S. 592, 598, 85 S.Ct. 1220, 14 L.Ed.2d 95, this Court stated that postacquisition evidence tending to diminish the probability or impact of anticompetitive effects might be considered in a § 7 case. (Citation omitted.) But in Consolidated Foods, supra, and in United States v. Continental Can Co., 378 U.S. (441) at 463, (84 S.Ct. 1738, 12 L.Ed.2d 953), the probative value of such evidence was found to be extremely limited, and judgments against the Government were in each instance reversed in part because 'too much weight' had been given to postacquisition events. The need for such a limitation is obvious. If a demonstration that no anticompetitive effects had occurred at the time of trial or of judgment constituted a permissible defense to a § 7 divestiture suit, violators could stave off such actions merely by refraining from aggressive or anticompetitive behavior when such a suit was threatened or pending.
 
 
 47
 Furthermore, the fact that no concrete anticompetitive symptoms have occurred does not itself imply that competition has not already been affected, 'for once the two companies are united no one knows what the fate of the acquired company and its competitors would have been but for the merger.' F. T. C. v. Consolidated Foods, supra (380 U.S.) at 598, (85 S.Ct. 1220). And, most significantly, § 7 deals in 'probabilities, not certainties,' Brown Shoe v. United States, 370 U.S. (294) at 323, (82 S.Ct. 1502, 8 L.Ed.2d 510) and the mere nonoccurrence of a substantial lessening of competition in the interval between acquisition and trial does not mean that no substantial lessening will develop thereafter; the essential question remains whether the probability of such future impact exists at the time of trial." United States v. General Dynamics Corp., 415 U.S. 486, 504-05, 94 S.Ct. 1186, 1197, 39 L.Ed.2d 530 (1974).
 
 
 48
 Ash Grove's post-acquisition evidence, even if believed, shows nothing more than that a quantum of competition remained in the KCMA cement industry after the acquisitions. This does not refute the government's extensive counterproof that anticompetitive effects were probable to occur and in fact actually did occur.
 
 
 49
 Moreover, the reliability of Ash Grove's post-acquisition evidence is questionable. At the hearing the Commission attorney exposed substantial discrepancies in the data on which Ash Grove's exhibits RX 19 and RX 25 were computed. Many of the remaining Ash Grove exhibits were derived from these two exhibits. The administrative law judge agreed to admit into evidence the two disputed exhibits and their progeny, but noted repeatedly his serious reservations about their probative utility, particularly for the post-acquisition years 1967-68. The highly substantial discrepancies in the reported data underlying these exhibits were never clarified. We will defer to the factfinder the determination of the weight and inference to be accorded such disputed evidence absent clear error.
 
 
 50
 Finally, perhaps the most compelling reason to reject Ash Grove's contention that the evidence is insufficient to support the Commission's findings is that Ash Grove's argument misconceives the nature of the substantial evidence standard. Even if we accepted Ash Grove's exhibits as reliable and agreed that a strong showing of no violation had been made, we must affirm the Commission if the record contains substantial evidence to support the Commission's findings. Here Ash Grove has made virtually no claim that the evidence presented to support the Commission's findings was insubstantial. Indeed such a contention would be frivolous. The FTC conducted hearings at which voluminous testimonial and documentary evidence was introduced by both sides. Extensive direct and circumstantial evidence in the record supports the conclusion eventually reached by the Commission. For all of the reasons stated above the Commission's findings and order must stand.
 
 
 51
 IV. DIVESTITURE.
 
 
 52
 Finally, Ash Grove contends it was error for the Commission to order divestiture because price competition appeared to increase with respect to both cement and concrete in 1967-68. Assertedly this proves that partial integration was healthy for the cement and concrete industries. In addition, Ash Grove argues that the remedy of divestiture is the most drastic of all antitrust remedies and should be applied only when warranted by sound factual bases supported by economic theory.
 
 
 53
 Price competition was prevalent during 1967-68 in the cement and concrete industries in the KCMA, but was shown by the record to be the result of desperation attempts by independents to maintain a foothold in the increasingly concentrated markets. As substantial consumers of portland were bought up by the cement suppliers, the independents began to offer selective, often secret, price cuts to customers simply to avoid permanent withdrawal from the market.
 
 
 54
 Price competition in an unconcentrated market is indeed a sign of healthy competition. However, a brief flurry of price competition in a heavily concentrated market which has the effect and possibly the purpose of destroying independent competitors is not a sign of a healthy market. Once the independents are eliminated there is no guarantee of continued low pricing from the large integrated suppliers who have acquired captive consumers.
 
 
 55
 Moreover, as already explained, post-acquisition evidence of continued competition is not entitled to determinative weight because it does not show what kind of competition might have remained had there been no illegal acquisitions. Remaining vigor in an industry cannot immunize an acquisition if the trend in that industry is toward ever increasing concentration.[15]
 
 
 56
 We note in conclusion that there is a sound basis in precedent for the application of the remedy of divestiture. The Supreme Court in U. S. v. duPont de Nemours & Co., 366 U.S. 316, 328-31, 81 S.Ct. 1243, 1252, 6 L.Ed.2d 318 (1961) held:
 
 
 57
 "It cannot be gainsaid that complete divestiture is peculiarly appropriate in cases of stock acquisitions which violate § 7. That statute is specific and " narrowly directed," Standard Oil Co. v. United States, 337 U.S. 293, 312, (69 S.Ct. 1051, 93 L.Ed. 1371) (1949), and it outlaws a particular form of economic control stock acquisitions which tend to create a monopoly of any line of commerce. The very words of § 7 suggest that an undoing of the acquisition is a natural remedy. . . . Of the very few litigated § 7 cases which have been reported, most decreed divestiture as a matter of course. Divestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found."
 
 
 58
 There was no error in the Commission's order of divestiture against Ash Grove.
 
 
 59
 V. CONCLUSION.
 
 
 60
 The order of the Federal Trade Commission is affirmed.
 
 
 
 *
 Honorable A. Andrew Hauk, United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 The cement industry was active in response to the opportunity to comment through oral and written statements. Ash Grove itself was among the members of the industry participating
 
 
 [2]
 The complaint also alleged a violation of Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45, because of Ash Grove's acquisition of assets from individuals which formerly had been a division of Union Construction Company of Kansas City, Missouri. The administrative law judge found this acquisition of Union's assets to violate Section 5 of the F.T.C. Act, but the Commission reversed his finding on appeal. This ruling by the FTC is not at issue in this appeal
 
 
 [3]
 As is true with many modern antitrust proceedings, the record in this case was voluminous. It consisted of 3546 pages of transcript, the testimony of 23 witnesses, 98 Commission exhibits and 107 exhibits by Ash Grove, excluding exhibits which were either rejected or withdrawn
 
 
 [4]
 The administrative law judge made 117 separate findings of fact. Generally, he found that portland cement and ready-mix concrete were proper lines of commerce within § 7 of the Clayton Act; that the KCMA was the proper section of the country within which to evaluate the effects of the acquisitions; that the effects of the acquisitions are or may be: (1) foreclosure of competitors from a segment of the market otherwise open to them, (2) to increase concentration in an already heavily concentrated market, (3) to increase barriers to entry into the KCMA cement industry, and (4) to force existing competitors out of business. Ultimately, therefore, the administrative law judge found the effects of the acquisitions may be substantially to lessen competition in the manufacture and sale of portland and ready-mix in the KCMA, constituting a violation of § 7 of the Clayton Act
 
 
 [5]
 One of the five Commissioners dissented in part from the decision and order of the Commission
 
 
 [6]
 The Chairman of the FTC informed Congress in February, 1966:
 "The program for fiscal 1967 contemplates the promulgation of a trade regulation rule on some aspect of the merger problem in the cement industry. The target date for the promulgation of the rule is June, 1967." Hearing Before the Subcommittee on Independent Offices of the Committee on Appropriations, U.S. House of Representatives, 89 Cong.2d Sess. at 383, 443 (Feb. 10, 1966). See also Statement of FTC Chairman, Hearings on Independent Office Appropriations Before the Committee on Appropriations, U.S. Senate, 89 Cong.2d Sess., pt. 1 at 461-462 HR 14921 (May 12, 1966).
 
 
 [7]
 The Economic Report itself states at page vii that it is only a staff report which the Commission has not approved or disapproved. The Commission further emphasized this fact in its subsequent Notice in the Federal Register, 31 Fed.Reg. 7772 (June 1, 1966)
 
 
 [8]
 In its Order and Opinion Denying Motion to Dismiss the Complaint in this case, the FTC cited extensively from its earlier interlocutory opinion and order, issued February 6, 1967 in Lehigh Portland Cement Company, Docket No. 8680, Marquette Cement Manufacturing Company, Docket No. 8685, and Mississippi River Fuel Corporation, Docket No. 8657, 71 F.T.C. 1618, where after again explaining the nature of the Enforcement Policy as an industry guide, the Commission held:
 "In each case the burden of proving the allegations of the complaint remains with complaint counsel, and has in no degree been shifted to the respondents. In each case, adjudication by the hearing examiner and the Commission will be made on the record, in accordance with the Administrative Procedure Act. In each case, the hearing afforded the respondents will be full and fair, in the same measure as if no Enforcement Policy had been issued. If the Commission's expertise has been enlarged as a result of the general inquiry conducted by it in connection with formulating the Statement of Enforcement Policy, that fact neither prejudices the respondents' rights nor constitutes any reason for dismissing these proceedings. Respondents are entitled to have their cases adjudicated by Commissioners with open minds, not empty ones. . . ." (71 F.T.C. 1619, 1621-22.) See Record, Volume III at 1366-67.
 
 
 [9]
 In National Petroleum Refiners Assoc. v. F. T. C., 157 U.S.App.D.C. 83, 482 F.2d 672 (1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974), this same argument was made with respect to essentially identical language found in § 5(b) of the Federal Trade Commission Act, 15 U.S.C. § 45(b). There Judge Skelly Wright ruled for the District of Columbia Circuit that the Commission's broad rulemaking power does not stand isolated from the Commission's enforcement and law-applying role. He stated:
 " . . . Section 5(b) does not use limiting language suggesting that adjudication alone is the only proper means of elaborating the statutory standard. It merely makes clear that a Commission decision, after complaint and hearing, followed by a cease and desist order, is the way to force an offender to halt his illegal activities." Id. 157 U.S.App.D.C. at 86, 482 F.2d at 675.
 Section 11(b) of the Clayton Act, relied upon by Ash Grove here invokes the FTC's enforcement authority in virtually the same manner for the Clayton Act as Section 5(b) does for the F.T.C. Act. Except for changes necessary because of the difference between the two acts, the wording in both statutes is identical. Our holding today confirms that § 11(b) of the Clayton Act was not intended to restrict the FTC's non-adjudicative investigative authority.
 
 
 [10]
 In its reply brief Ash Grove goes to great length to distinguish between a "trade regulation rule proceeding" and a "pre-adjudicative complaint investigation", contending the former are ultra vires whereas the latter are permissible modes of enforcing the Clayton Act
 
 
 [11]
 Note that four of the five members of the Commission who decided the Ash Grove case (including three of the four member majority) were not members of the Commission when the Enforcement Policy was developed
 
 
 [12]
 See n. 3, supra
 
 
 [13]
 See Section III, infra
 
 
 [14]
 "Incipiency" in this context denotes "not the time the stock was acquired, but any time when the acquisition threatens to ripen into a prohibited effect." United States v. du Pont de Nemours & Co., 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957)
 
 
 [15]
 Ash Grove also implies that the fact that over ten years have elapsed since the acquisitions mitigates against the remedy of divestiture. But, "(t) hat is not the law; the passage of time per se is no barrier to divestiture of stock illegally acquired. United States v. Du Pont, 353 U.S. 586, 590, (77 S.Ct. 872, 1 L.Ed.2d 1057); 366 U.S. 316, (81 S.Ct. 1243, 6 L.Ed.2d 318)." United States v. Greater Buffalo Press, 402 U.S. 549, 556, 91 S.Ct. 1692, 1697, 29 L.Ed.2d 170 (1971)