**JBL ENTERPRISES, INC., et al., Plaintiffs,**

**v.**

**JHIRMACK ENTERPRISES, INC., Defendant.**

**Al BOOTH, et al., Plaintiffs,**

**v.**

**JHIRMACK ENTERPRISES, INC., et al., Defendants.**

Nos. C–78–1227–WWS, C–80–0249–WWS.

United States District Court, N. D. California.

Feb. 25, 1981.

Charles Lamont, Kithas & Lamont, Robert Cartwright, Cartwright, Sucherman, Slobodin & Fowler, San Francisco, Cal., for plaintiffs.

Eugene C. Crew, Broad, Khourie & Schulz, Michael St. Peter, Lukens & St. Peter, San Francisco, Cal., for defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OF OPINION ON ISSUES OF RELEVANT MARKET, MARKET SHARE AND LAWFULNESS OF TYING ARRANGEMENT

SCHWARZER, District Judge.

I. *PROCEDURAL BACKGROUND*

*JBL Enterprises, Inc., et al. v. Jhirmack Enterprises, Inc.,* C–78–1227–WWS. This action is brought by three former distributors, JBL Enterprises, Inc. (formerly doing business as Jhirmack of Utah); Jean Robinson (formerly doing business as Jhirmack of Idaho and Jhirmack of Boise); and Lois Jean Million (formerly doing business as Jhirmack of Indiana and Jhirmack of North Central Indiana), against Jhirmack Enterprises, Inc. ("Jhirmack"), the manufacturer of a line of beauty and cosmetic products sold throughout the United States under the name "Jhirmack" and formerly distributed by plaintiffs.

The three plaintiffs allege that Jhirmack violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act by imposing unreasonable customer and territorial restrictions, tying undesired products to the right to purchase desired products and to the right to use Jhirmack's name, and wrongfully terminating distributorships. Additional counts allege breach of contract, fraud, negligent misrepresentation and interference with business.

*Alfred Booth, et al. v. Jhirmack Enterprises, Inc., et al.,* C–80–0249–WWS. This action is brought by two former distributors of Jhirmack, Jhirmack of Washington, D.C., Inc.; Thelma R. Bean and Alfred Booth, respectively president and vice president of Jhirmack of Washington, D.C., Inc.; Jhirmack of Southwestern Pennsylvania, Inc.; and Walter Cecchini, president of Jhirmack of Southwestern Pennsylvania, Inc., against Jhirmack; Mrs. Irene Redding, president and chief executive officer of Jhirmack; Albert L. Schwartz, Secretary-Treasurer of Jhirmack; Gary McCord, vice president of Jhirmack for marketing; International Playtex, Inc. ("Playtex"); Joel E. Smilow, president of Playtex; and Esmark, Inc., the parent corporation of Playtex.

The *Booth* complaint alleges various antitrust violations arising out of the agreement between Jhirmack and Playtex assigning to Playtex the exclusive rights to distribute Jhirmack products nationally to over-the-counter outlets. Plaintiffs allege that the contract violates Section 1 of the Sherman Act, that Playtex and Jhirmack have monopolized, conspired to monopolize and attempted to monopolize in violation of Section 2 of the Sherman Act, that plaintiffs were wrongfully terminated in violation of Section 3 of the Clayton Act, that the option agreement between Playtex and Jhirmack violates Section 7 of the Clayton Act, and that Jhirmack committed various other antitrust violations including tying and territorial restrictions. The remaining 16 counts of the complaint, based on the same facts, consist of counts of false labelling and interference with the Constitutional right of free association, and various pendent state claims including fraud, breach of contract, negligent and intentional interference with contract, intentional infliction of emotional distress, etc.

On June 12, 1980, pursuant to Fed.R. Civ.P. 42, the Court, with the consent of the parties, consolidated the two actions for a separate trial of all issues regarding (1) the relevant market, (2) defendant Jhirmack's share of the relevant market, and (3) whether Jhirmack instituted an unlawful tying arrangement as to any of its products. *See* Pretrial Order No. 1, a copy of which is attached as Exhibit A. The Pretrial Order reserved for later trial issues regarding jus-

tification, causation, and damages for any proven tying arrangement, and other liability issues. On August 15 and September 12, 1980, pretrial conferences were held to discuss subsequent proceedings.[1]

Pursuant to the provisions of paragraph 5 of the Pretrial Order, the parties made written submissions before the trial. Plaintiffs filed a joint trial brief, and narrative written statements by James Schilt, a financial analyst, on market share; Gary McCord, former vice president of marketing for defendant Jhirmack and himself a named defendant who settled with plaintiffs, on various marketing policies of Jhirmack; John Williams, president of plaintiff JBL Enterprises, Inc., on his company's experiences as a Jhirmack distributor; Walter Cecchini, plaintiff and president of plaintiff Jhirmack of Southwestern Pennsylvania, Inc., on his company's experience as a Jhirmack distributor; and Alfred Booth, plaintiff and vice president of plaintiff Jhirmack of Washington, D.C., Inc., on his company's experience as a Jhirmack distributor.

Defendant Jhirmack filed a brief, and narrative written statements by Irene Redding, president and chief executive officer of defendant Jhirmack and a named defendant, regarding the relevant market and tying issues; Dr. G. Stephen Jizmagian, an economist, regarding the relevant market; Rafael Akyuz, vice president for research and development of defendant Jhirmack, on flexibility of production in the beauty and cosmetics industry; and Robert Cordell, vice president for manufacturing of defendant Jhirmack, on flexibility of production in the beauty and cosmetics industry.

Defendant Playtex filed a brief, and narrative written statements by Mark Lowenthal, director of marketing for the Family Products division of defendant Playtex, on relevant market, Playtex's marketing analysis and decisions, and the effect of the Jhirmack-Playtex marketing agreement on competition; and Dr. James Carman, professor of business administration, on rele-

vant market, Jhirmack's share of the relevant market, and the effect of the alleged restraint upon competition in the relevant market.

On September 22, 23, 24, and 25, 1980, and January 12, 1981, the relevant market, market share, and tying issues were tried to the Court. Mrs. Redding, Mr. McCord, Mr. Schilt, Mr. Williams, Mr. Lowenthal, Mr. Booth, Mr. Cecchini, Dr. Jizmagian, and Dr. Carman appeared, their written statements were received as exhibits and they were examined and cross-examined by counsel. The narrative written statements of Mr. Akyuz and Mr. Cordell were received as exhibits. Plaintiffs also called as a witness John White, a beauty supply distributor and former sales manager and distributor-coordinator for defendant Jhirmack. The parties have submitted briefs and oral argument has been heard. The ruling which follows constitutes the Court's findings of fact and conclusions of law on the foregoing bifurcated issues.

## II. FACTUAL BACKGROUND

Defendant Jhirmack manufactures a line of hair care and beauty products which are distributed throughout the United States by licensed distributors. The company was founded in 1968 by Jheri Redding and his wife Irene Redding. Jhirmack introduced its first line of hair and beauty products in 1972. Presently shampoos and conditioners account for approximately 80% of its production. Jhirmack initially arranged to market its products to consumers exclusively through what are called professional outlets or the salon trade, consisting of beauty salons, barber shops, hair styling establishments, beauty schools, barber schools, and beauty supply houses. Jhirmack assigned geographic areas to independent distributors, who were required to devote their best efforts to distribute Jhirmack products to professional outlets.

Although Jhirmack initially manufactured its products for resale exclusively

---

1. Since that time, an additional action asserting claims arising out of the same circumstances as the *JBL* and *Booth* complaints was transferred to this district, and consolidated with these actions on October 28, 1980. *Jhirmack of Cincinnati v. Jhirmack Enterprises*, C–80–3699.

through professional outlets, some of Jhirmack's products were "diverted" by distributors for eventual resale to consumers through other distributors and other types of outlets, including discount houses, drug, food, and department stores (referred to as "over-the-counter" or "OTC" outlets). Jhirmack received complaints from salon owners and distributors about instances of diversion to OTC outlets, and took steps to identify the distributors involved and to discourage this activity.

Since 1974, Jhirmack, relying on the provision in the distributor agreements obligating distributors to comply with company policies and procedures, has required its distributors to place an initial order for a specified quantity of each new product. Under this "new product quota" program, Jhirmack calculated each distributor's quota based on the number of potential professional accounts in that distributor's territory. Jhirmack warned its distributors that it would not fill orders which did not include the new products required under the quota program, and on occasion has rejected orders for that reason.

In April 1978 Jhirmack cancelled the distributorship of plaintiff JBL Enterprises, Inc. JBL had refused over a period of several months to order certain new products as required under the quota program, and had participated in diverting Jhirmack products to OTC outlets.

On October 9, 1979, Jhirmack arranged to market its products through OTC outlets by appointing Playtex exclusive distributor of its products "for all channels of trade excluding the professional salon trade." The agreement obligated Playtex to make certain expenditures for promotion and advertising of its Jhirmack products. Playtex presently distributes seven Jhirmack shampoo and conditioner products, including two shampoos and four conditioners known as the "Basic Six" (E.F.A. Shampoo, Gelave Shampoo, MoisturepHlex Conditioner, pHi-

nale Conditioner, N.C.A. Conditioner, and NutriPak Conditioner). These six products accounted for approximately 67 to 68% of Jhirmack's sales in 1977, 1978, and 1979.

Following the execution of the marketing agreement with Playtex, Jhirmack sent new distributorship agreements to its existing distributors under which they were to continue the exclusive distribution of Jhirmack products through professional outlets but with the understanding that Playtex would soon begin operating as exclusive distributor of Jhirmack products to OTC outlets. The *Booth* plaintiffs are former Jhirmack distributors who were offered the revised distributorship contracts at that time but refused to sign them. Jhirmack terminated those plaintiffs' distributorships in December 1979.

This opinion addresses two issues:

(1) What is the relevant market for the purpose of determining whether the restraints allegedly imposed by Jhirmack on its distributors' selling outside of their territory and to purchasers other than professional or salon outlets, and the alleged tying arrangements, could be found to have an impact on competition; and

(2) Does Jhirmack's new product quota, requiring its distributors to place an initial order for each new product, constitute an unlawful tying agreement.

Part III of the opinion will deal with the first issue, part IV with the second.

### III. THE ALLEGED RESTRAINTS ON CUSTOMERS AND TERRITORY— RELEVANT MARKET

For purposes of this opinion, the Court accepts the allegations of the complaints to the effect that Jhirmack imposed customer and territorial restrictions on the sale of its products by its distributors. Those restrictions are alleged to be unreasonable restraints of trade.[2]

---

**2.** No claim is made that these restrictions amount to *per se* violations. *See Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977);

*Gough v. Rossmoor Corp.*, 585 F.2d 381, 388 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979).

■ Under the rule of reason analysis, plaintiffs must demonstrate that defendant's alleged conduct had an impact on competition in the relevant market. In *DeVoto v. Pacific Fid. Life Ins. Co.*, 618 F.2d 1340, 1344–45 (9th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980), the Ninth Circuit stated the controlling principles as follows:

A crucial aspect of a plaintiff's case under the rule of reason is a demonstration that the alleged conduct of the defendant had some market impact. *See Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 615, 73 S.Ct. 872, 883–84, 97 L.Ed. 1277 (1953); *Associated Press v. United States*, 326 U.S. 1, 27, 65 S.Ct. 1416, 1428, 89 L.Ed. 2013 (1945) (Frankfurter, J., concurring); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1247 (3d Cir. 1975). As this court recently stated, "Unless the alleged anticompetitive conduct is per se unreasonable, the fact that the conduct restrained trade in a relevant market is an essential part of a plaintiff's case ... and the burden of establishing it lies on him." *Gough v. Rossmoor Corp.*, 585 F.2d 381, 385 (9th Cir. 1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). This court and others have repeatedly emphasized that "[t]he antitrust laws ... were enacted for 'the protection of competition, not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoted in *Gough, supra,* 585 F.2d at 386) (emphasis in original) (citation omitted), and therefore the plaintiff must show something more than simply an adverse effect on his own business; he must show "an adverse impact on the competitive conditions in general as they exist within the field of commerce in which the plaintiff is engaged." *Gough, supra,* 585 F.2d at 386. Absent per se violation, competitive injuries must be defined in terms of a discrete market.

\* \* \* \* \* \*

The Supreme Court has stated that the appropriate focus in determining reasonableness under section 1 focuses on "the percentage of business controlled, the strength of the remaining competition, [and] whether the action springs from business requirements or purpose to monopolize." *United States v. Columbia Steel Co.*, 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948) (quoted in *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 615, 73 S.Ct. 872, 884, 97 L.Ed. 1277 (1953)).

■ The analysis must therefore begin with a determination of the relevant market, i. e., "the field of commerce in which the plaintiff was engaged." *Gough*, 585 F.2d at 389.

■ The burden of proving the relevant market rests on plaintiff. *Id.*, 585 F.2d at 385. At the trial plaintiffs undertook to prove a relevant market comprising sales of shampoos and conditioners at retail by beauty salons and professional outlets. The Court rejects the market proposed by plaintiffs for two separate and independent reasons:

(1) It does not comprise the field of commerce in which plaintiffs are engaged;

(2) It does not constitute a distinct submarket within the market comprising the sale of shampoos and conditioners to consumers.

In the discussion which follows, the Court will analyze the evidence bearing on each of the foregoing propositions. Before doing so, however, a threshold issue must be addressed with respect to the *Booth* action: whether the injury complained of is cognizable antitrust injury.

A. *The Booth Action Does Not Allege Injury Cognizable Under the Antitrust Laws.*

Section 4 of the Clayton Act (15 U.S.C. § 15) permits recovery of damages under the antitrust laws by "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws ..." To recover damages plaintiff "must prove *antitrust* injury, which is

to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). As the Ninth Circuit stated in *Cal. Computer Products v. Intern. Business Machines*, 613 F.2d 727, 732 (9th Cir. 1979):

> Satisfying the latter burden is dependent on a showing that the injury was caused by a reduction, rather than an increase, in competition flowing from the defendant's acts, since "[t]he antitrust laws . . . were enacted for 'the protection of *competition* not *competitors*,'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. at 488, 97 S.Ct. at 697, quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). *See Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir. 1978). Accordingly, the plaintiff must demonstrate that the defendant's conduct was intended to or did have some anticompetitive effect beyond his own loss of business or the market's loss of a competitor.

The *Booth* action appears to have been initiated in total disregard for these clear and settled principles. The substance of the complaint's charging allegations is contained in paragraph 17, which states in relevant part that

> defendants Jhirmack, Redding, Schwartz, McCord, and each of them, have engaged in agreements, combinations, and conspiracies with defendants Playtex, Smilow, Esmark, and other unnamed coconspirators, and each of them, to unlawfully

restrain the aforesaid trade and commerce in violation of Section 1 of the Sherman Act, and have specifically entered into a marketing agreement which would grant defendants Playtex, and each of them, a license to sell the Jhirmack products to retailers; have attempted to monopolize, have monopolized, and will continue to monopolize, and have combined and conspired to monopolize, the aforesaid trade and commerce in violation of Section 2 of the Sherman Act by wrongfully terminating without cause the Distributor Agreements of plaintiffs, and each of them, in order to allow defendants Playtex, Smilow, Esmark, unnamed conspirators, and each of them, to enter the territory of plaintiffs and to market said Jhirmack products over-the-counter in retail stores, thereby competing unfairly and substantially lessening competition and tending to create a monopoly in the aforesaid trade and commerce in violation of Section 3 of the Clayton Act.

Paragraph 18 enlarges on these allegations, complaining that because of Jhirmack's agreement with Playtex, providing for the distribution of Jhirmack products by Playtex through OTC channels in addition to the existing distribution to professional outlets by Jhirmack's own distributors, plaintiffs lost the exclusive territories and markets they had developed in the salon trade.

█ These allegations on their face do not state a claim actionable under the antitrust laws.[3] Even if, as the *Booth* plaintiffs

---

**3.** The following colloquy during closing argument sheds further light on the nature of the *Booth* claim:

> THE COURT: What happened? What did Jhirmack do that's a violation of the antitrust laws?
>
> MR. CARTWRIGHT: By giving the business, taking the business away, the professional product from the professional market, and putting it over the counter through Playtex, they have, in effect, destroyed Jhirmack's and my client's market in the professional market. They have destroyed that market; and it's tended towards the creation of a monopoly on the part of Redken and the

others that service that market and so they have decreased the amount of competition dramatically in the professional market, whereas, according to some of the testimony that we have in the record, Jhirmack was number one in that market. Now, it's zilch.

> THE COURT: So what you're saying is that the violation of the antitrust laws consisted of the agreement between Jhirmack and Playtex by which . . . the ability of the distributors to sell Jhirmack products exclusively was taken away and destroyed and they faced the competition of OTC outlets?
>
> MR. CARTWRIGHT: They put them out of business is what happened.

claim, their ability to sell Jhirmack products to salons has been injured by Playtex's distribution of Jhirmack shampoos and conditioners to OTC outlets, given the preference of salons to sell brands having no OTC distribution, that injury results from an increase in competition, not a restraint on competition. The antitrust laws are intended to protect competition, not individual competitors. *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 855 (9th Cir. 1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). Regardless of the outcome of the relevant market analysis, the *Booth* plaintiffs would be precluded from recovering for injury to their businesses for failure to show antitrust injury under *Brunswick. See BBD Transportation Co. v. Southern Pacific Transportation Co.,* 627 F.2d 170, 172 (9th Cir. 1980); *Murphy Tugboat Co. v. Crowley,* 454 F.Supp. 847, 852 (N.D.Cal.1978) (on appeal). This matter will be considered in further proceedings as provided below.

Apart from the foregoing defect, however, the *Booth* action would be governed by the same relevant market analysis as the other actions discussed in the following sections.

**B.** *The Relevant Market Comprises the Sale of Beauty Products to Professional Outlets.*[4]

Under *Gough v. Rossmoor Corp.,* the relevant market consists of the field of commerce in which plaintiff is engaged. 585 F.2d at 389. The initial step in the rule of reason analysis must be the "consideration of the impact of the restraint on the competitive conditions within the field of com-

\*     \*     \*     \*     \*     \*

THE COURT: Now, let me ask you a question. I understand the injury to your people. What is the injury to competition?

MR. CARTWRIGHT: They dramatically reduced the competition in the market that we're talking about. Jhirmack no longer is an effective competitor in that market and at the time this happened was either number one or number two in the professional market; so they have destroyed competition in

merce in which the plaintiff was engaged." *Id.*

Plaintiffs were engaged in the distribution and sale of beauty products, principally but not exclusively shampoos and conditioners, to beauty salons and other types of professional outlets. The alleged restraints affected plaintiffs in the wholesale distribution of Jhirmack products. Thus, JBL's first amended complaint alleges that plaintiffs' distributorship agreements with defendant Jhirmack were "subject to unreasonable territorial and customer restraints, thereby precluding its distributors from free and unrestricted competition." (p. 4) The customer restraint alleged was the specification in the distributorship agreement that distributors were to sell Jhirmack products to beauty salons, beauty schools, barber schools, and men's hairstyling establishments. Plaintiffs complain that they were not allowed to sell Jhirmack products to other distributors. This restriction had the effect of "eliminating the discounting of defendant's products by distributors, subdistributors, beauty and barber supply houses, cash-and-carry stores, salons, discount houses, drug stores and other entities . . . thereby precluding its distributors and other sellers of the products from free and unrestricted competition." (p. 4) Even if the effects of any restraint may have been felt throughout the chain of distribution, the impact of the alleged territorial and customer restrictions fell upon plaintiffs in their sales to professional outlets.

The distribution of shampoos and conditioners, and other beauty products as well, occurs through several channels, as the following diagram shows:

substantial part in the professional market dramatically, dramatically reduced it.

THE COURT: So what you're saying is that they have reduced competition by making it unattractive to salons to continue to carry Jhirmack because it's been sold OTC; is that right?

MR. CARTWRIGHT: As a practical matter they can't do it.

4.   The parties agree that the relevant geographic market consists of the entire United States.

VERTICAL DISTRIBUTION FOR SHAMPOOS AND CONDITIONERS

(Def. Ex. IPI–B)

Plaintiffs, at least according to the position they have taken in this trial, sell only to salon and other professional outlets. That field of commerce is distinct from other channels of distribution. Plaintiffs compete with other so-called single line distributors, i. e., distributors carrying the products of only a single manufacturer. They also compete with barber and beauty supply houses, or jobbers, which carry a number of different lines for distribution to the professional trade. Finally, they compete to a minor extent with those manufacturers who sell directly to the professional trade.

█ The relevant market in which plaintiffs compete—and in which the impact of any restrictive practice must be evaluated—

is therefore the market for the sale of relevant products to the professional trade. *See Tire Sales Corp. v. Cities Service Oil Co.*, 410 F.Supp. 1222 (N.D.Ill.1976) (relevant market defined as sales of tires, batteries and accessories to service stations and other retail outlets in South Chicago); *South End Oil Co. v. Texaco, Inc.*, 237 F.Supp. 650 (N.D.Ill.1965) (relevant market consisted of discount houses and other retailers to which plaintiff sold).

Plaintiffs contend that the relevant products must be limited to shampoos and conditioners. They argue that shampoos and conditioners represent about 80% of Jhirmack's sales, and that the Playtex arrangement for OTC distribution applies only to shampoos and conditioners.[5] Plaintiffs rely on the general principle that the relevant

5. Plaintiffs also argue that shampoo and conditioners must be treated as a separate line for two additional reasons. They say that the demand for sales outside of assigned territories was mainly for shampoos and conditioners and that those products must therefore be treated as a separate line. The evidence shows, however, that the amount of diversion represented

by shampoos and conditioners was roughly in proportion to their share in total sales of Jhirmack products. Second, they contend that some Jhirmack distributors had trouble selling cosmetics. But the evidence indicates that the difficulties arose from competitive conditions: price, lack of uniqueness and the time and manner of introduction.

**368**

product market consists of "those commodities reasonably interchangeable by consumers for the same purpose." *United States v. E. I. du Pont & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956).

The principle of reasonable interchangeability must, however, be applied with reference to the specific market involved. While shampoo and lipstick are, of course, not interchangeable for the end user of the product, the relevant market here is not the sale to the end user but the sale to professional outlets. The evidence establishes that professional outlets, as well as the manufacturers and distributors who serve them, tend to deal in the entire range of beauty products. Professional outlets purchase full lines of beauty products from their suppliers, including shampoo, hair conditioner, hair spray, hair color, permanents, skin care products, cosmetics, and fragrances.[6] Sellers at the several levels of distribution compete on the basis of manufacturers' brands or lines spanning the beauty products field. The ten largest manufacturers selling to the salon trade produce cosmetics as well as hair products, and six of those ten also produce fragrances. Manufacturers like Jhirmack have been introducing more cosmetic products to fill out their lines, taking advantage of brand loyalty carrying over from one category of beauty products to another. Revlon, for example, has benefited in the sale of hair products from its reputation as a manufacturer of cosmetics. As one witness put it, "It's part of the business to have a full line." Jhirmack itself sells shampoo, conditioner, hair color, permanents, skin care products, cosmetics, and fragrances. At the wholesale level both types of salon distributor, beauty supply houses and single line distributors, handle the entire range of beauty products. Single line distributors carry a single manu-

facturer's line; beauty supply houses the lines of a number of manufacturers. Thus not only Jhirmack distributors but their competitors carry full lines of beauty products, as do their customers at the retail level.

In arguing that the relevant market must be limited to shampoos and conditioners, plaintiffs also rely on *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576 (S.D.N.Y.1958), and *Crown Zellerbach Corp. v. F.T.C.*, 296 F.2d 800 (9th Cir. 1961), cert. denied, 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962). In *Bethlehem Steel* the United States sought to enjoin a merger of the second and sixth largest steel corporations. Defendants contended that a number of distinct finished steel products manufactured by the two companies constituted a single relevant line of commerce because steel producers had the capacity to allocate ingot supply among finishing facilities according to demand. The Court rejected this production flexibility argument, finding that in practice "steel producers have not been quick to shift from product to product in response to demand. Moreover, the evidence establishes that the continuing relationships between buyers and sellers in the steel industry make such shifts unlikely." 168 F.Supp. at 592.

In *Crown Zellerbach* the Ninth Circuit reviewed an order of the Federal Trade Commission directing Crown Zellerbach to divest itself of a smaller paper company which it had acquired. Crown Zellerbach argued that production flexibility created a relevant product market consisting of all the types of paper which standard papermaking machinery could be adapted to produce. The court rejected the production flexibility argument, citing *Bethlehem Steel* and saying that "[w]hat was turned

---

**6.** Salons buy products for two purposes, professional use and retail sale. The difference lies in the packaging; supplies for professional use come in large packages, sometimes fitted with special attachments for dispensing. While products packaged for professional use serve a different purpose for the salon from retail packages, that difference is irrelevant to the distributor selling to the salon. Further-

more distributors' sales of professional use products are related to sales of retail products in that salons will buy a brand for use in the salon in order to promote the retail sale of that brand to their clients. Both professional use and retail beauty products are therefore a part of a single relevant market at the distributor level.

out of the Fourdrinier machines depended altogether on what orders [the acquired company] had and what it knew it could sell. What those orders were and what it found a market for were presumably the products which it did sell." 296 F.2d at 812.

In the instant case, however, it is not the manufacturers' production flexibility that supports treating salon beauty products as a single line of commerce constituting the relevant market. Rather it is the way in which these articles move at the wholesale level and compete as a single line of products. Lipstick, for example, although having a different end use from shampoos, is made by the same manufacturers and distributed to salons as a part of a line which includes shampoo. A similar product market comprehending a range of distinct products was found in *A. G. Spalding & Bros., Inc. v. F.T.C.*, 301 F.2d 585, 604 (3d Cir. 1962), *aff'g* 56 F.T.C. 1155. There the court found higher priced athletic goods to be a relevant market where the largest manufacturers each made a full line of goods and each grouped its line of products together for promotion and distribution. *See United States v. Philadelphia National Bank*, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963) (relevant product market defined as "cluster" of products and services provided by commercial banks); *United States v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 360, 90 S.Ct. 2035, 2041, 26 L.Ed.2d 658 (1970) (same product market as in *Philadelphia National Bank* ); *United States v. Grinnell*, 384 U.S. 563, 573, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1966) (relevant product market defined as cluster of accredited central station alarm services); *United States v. Hughes Tool Co.*, 415 F.Supp. 637, 641 (C.D.Cal.1976) (relevant product market defined as "cluster of specialized surface rotary drilling tools").

■ The evidence, therefore, compels a finding that for purposes of these actions the relevant market comprises the sale of beauty products, including but not limited to shampoos and conditioners, to beauty salons and other professional outlets. Plaintiffs have produced no data to reflect

the share of that market held by Jhirmack, or Jhirmack products. The evidence in the record does, however, permit the Court to arrive at an approximation sufficient to support a finding.

■ Initially, it must be noted that none of the market share data in the record inspire confidence. They come either from industry publications, which do not disclose the methods used in their compilation and are not subject to verification, or from the Department of Commerce's Census of Manufacturers, whose categories are so broad and vaguely defined that the specific products at issue here could have been reported by manufacturers in any of several different statistical categories. The figures are nevertheless acceptable for present purposes inasmuch as both sides rely on them and the results they show are so decisive that there is no reason to believe that accounting or reporting differences would affect them. These figures show that manufacturers' shipments of beauty products for retail and professional use in the salon trade totalled approximately $398.9 million in 1976, $434.6 million in 1977, and $483.4 million in 1978. Jhirmack's factory sales are estimated by defendants to be approximately $9.0 million in 1976, $13.9 million in 1977, and $20.1 million in 1978, resulting in a market share of beauty products of 2.3% in 1976, 3.2% in 1977, and 4.2% in 1978. If all manufacturers' shipments of beauty products are included, being potentially competitive in the sale to professional outlets, Jhirmack's share would decline to 0.3%.

C. *The Sale of Shampoos and Conditioners Through Professional Outlets Does Not Constitute a Distinct Submarket.*

Plaintiffs contend, however, that the relevant market consists of the sale of shampoos and conditioners to consumers for home use, and that Jhirmack's market share must be determined with reference to a distinct submarket limited to retail sales through salons and other professional outlets. For the reasons explained in the foregoing section of this opinion, the Court has found that the relevant market lies at the

wholesale level at which plaintiffs compete, not at the retail level at which their customers compete. However, inasmuch as the parties have devoted substantial resources to litigating this contention, and in the interest of reaching a complete adjudication, the Court will proceed to determine the question whether a submarket as claimed can be found to exist here.

Plaintiffs, to sustain their submarket theory, have to establish that the salon submarket is

> sufficiently distinct in commercial reality to permit a company that dominated [it] to exclude competition and control prices. This depends on whether efforts to exclude competition or control prices in the [submarket] in question would be negated by a shift of buyers to other portions of the market. (citations omitted)

*Greyhound Computer v. Intern. Business Machines*, 559 F.2d 488, 493 (9th Cir. 1977). In *ILC Peripherals v. Intern. Business Machines*, 458 F.Supp. 423, 428 (N.D.Cal.1978), the court commented that "[t]his inquiry boils down to whether there are products that restrain a defendant's ability to act without regard for other manufacturers and suppliers." Market definition has also been characterized as "a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978). In *United States v. Empire Gas Corp.*, 537 F.2d 296, 303 (8th Cir. 1976), the court stated, "[w]hether a particular product's sales constitute a relevant market or submarket depends on the cross-elasticity of demand for that product; in other words, the readiness and ability of consumers to turn to reasonable alternatives to the product in question."

But plaintiffs' claim that the salon market is distinct from the OTC market and not an interchangeable source of supply for consumers runs head-on into their contention that the alleged restraints by defendants prevented them from diverting their products (directly or indirectly) to OTC outlets and "eliminat[ed] the discounting of defendant's products by ... discount houses, drug stores and other entities." Moreover, the gravamen of the *Booth* complaint, and to a lesser extent of the other actions, is that by allowing its products to be sold by Playtex to OTC stores, Jhirmack exposed plaintiffs' customers, the salons, to direct competition in the sale of Jhirmack products. In short, if two different types of retail stores compete for the patronage of consumers in the sale of identical products (albeit at different prices), it is difficult to sustain a contention that, for antitrust purposes, those stores are in distinct submarkets.

Nevertheless, plaintiffs contend that the salon and professional trade constitutes a distinct submarket, relying on *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962), in which the Court said:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593–95 [77 S.Ct. 872, 877, 1 L.Ed.2d 1057]. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. (footnotes omitted)

There the Supreme Court affirmed the trial court's findings rejecting defendant's claims of relevant submarkets of men's, women's and children's shoes based on differences in price, quality, and customer age and sex. Although *Brown Shoe* was a merger case under Section 7 of the Clayton Act, the decision provides indicia generally applica-

ble to Section 1 and 2 cases. It must, however, be applied with due regard for the observation of the Ninth Circuit that

> [t]hese indicia were listed with the intention of furnishing practical aids in identifying zones of actual or potential competition rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue. Whether or not a court is justified in carving out a submarket depends ultimately on whether the factors which distinguish one purported submarket from another are "economically significant" in terms of the alleged anticompetitive effect.

*International T. & T. Corp. v. General T. & E. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975).

■ Before examining the evidence in light of the *Brown Shoe* indicia, it is useful to note what lies at the heart of plaintiffs' submarket contention and—for that matter—at the heart of their lawsuits. The essence of the entire controversy is that beauty salons insist on carrying only shampoos, conditioners and other beauty products which are not generally available at OTC outlets. There is abundant evidence that beauty salons have discontinued buying certain brands—including Jhirmack— once the brands could be purchased at drug and discount stores and similar outlets. By their course of conduct, therefore, salon operators have generally prevented direct competition with OTC outlets in the sale of particular brands and have succeeded in maintaining a price range for shampoos and conditioners generally higher than that prevailing at OTC outlets.

A distinct submarket for shampoos and conditioners does not come into existence, however, simply because particular brands may be distributed exclusively through salon outlets. Moreover, it would be offensive to the spirit of the antitrust laws to permit plaintiffs to bottom their antitrust claim on their customers' pursuit of a patently anti-competitive practice.[7]

Turning to plaintiffs' claim of a relevant submarket limited to sales of shampoo and conditioners through salons and other professional outlets, the indicia set forth in *Brown Shoe* must be applied to the evidence.

### (1) *Industry and Public Recognition*

There is substantial evidence showing that the salon trade maintains a distinctive identity and seeks to promote a professional image. It has its own associations and publications. Many salons insist on selling only shampoos and conditioners which are not distributed in the OTC trade. Manufacturers cater to salons by producing shampoos and conditioners specifically for them, trying to prevent diversion of those products into OTC outlets, and designing products and packaging that emphasize the importance of professional hair care and the professional prescription of products for home use. Manufacturers like Jhirmack and Redken have developed extensive seminar

---

**7.** Plaintiffs' reliance on *United States v. CBS, Inc.*, 459 F.Supp. 832 (C.D.Cal.1978), is misplaced. In that case the court held that a relevant submarket might be found to exist even if it was the product of anticompetitive practices. But it did so at the instance of plaintiff and for the purpose of imposing liability on defendant for the very practices which caused the submarket to exist. See discussion of a similar point in *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 377, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927):

> The jury was instructed, in substance, that if, during the preceding period in which the plaintiff had been a customer of the defendant, it had not merely bought goods from the defendant because of a business necessity, but, with a knowledge of the defendant's pur-

pose to monopolize, had knowingly and willfully helped to build up the monopoly, it was in pari delicto, and hence could not recover any damages whatever on account of the defendant's refusal to continue to sell it goods; and, further, that even if the plaintiff had not been a party to the monopoly, it could not recover damages on the basis of the profits which it had earned while a customer of the defendant to the extent that they had been increased by the monopoly and exceeded those in a normal business, but that they must be reduced to the basis of normal profits.

> We find, under the circumstances of this case, nothing in these instructions of which the defendant may justly complain.

programs to enable salon personnel to appear more expert and to enhance the prestige of salons and salon products. Some manufacturers produce only for salons. Those that sell the same product in both channels, such as Revlon, use a separate division to sell to salons.

Other evidence shows, however, that OTC shampoos and conditioners compete directly with salon products, and that manufacturers of salon brands consider themselves to be in competition with the entire industry.[8] Various of the plaintiffs themselves testified that all manufacturers compete for sales to consumers; that Jhirmack as a salon brand was in competition with "everything that is sold," that "everyone sells shampoos;" and that their hair care products competed with products sold by Safeway. Although salons compete as specialty shops, holding out higher quality at higher prices, they are considered by the industry to be in competition for the same ultimate consumer of shampoo for home use.

## (2) Characteristics and Uses

Plaintiffs do not contend that salon shampoos and conditioners have uses or properties not found in OTC products. All shampoos and conditioners perform essentially the same functions; while the many brands available feature a diversity of ingredients, there is no systematic difference between salon products and OTC products. A successful new product is soon imitated by other brands in both the salon and OTC trades. Plaintiffs contend, however, that consumers perceive shampoos and conditioners sold in salons to be superior to OTC products, and that this perception substantially insulates salons from the competition of the broader market.

The evidence suggests that consumers generally associate salon products with superior quality. However, they do not necessarily associate professional characteristics exclusively with salon products. Although some customers value the endorsement and sale by salons, others are influenced by the promotion of a product as professionally formulated and endorsed regardless of where it is sold.

A number of brands in the salon trade have been successfully marketed in the much larger OTC trade on the strength of their salon origins and the resulting consumer perception that they were of professional quality and professionally endorsed. Salons sometimes serve as springboards enabling salon brands to gain entrance to the larger OTC trade, as in the cases of Clairol, Vidal Sassoon and L'Oreal. Some brands are widely distributed for retail through both salons and OTC outlets on a regular basis. Revlon Flex, for example, is highly successful in both channels of distribution. There is also evidence suggesting that unauthorized diversion to OTC outlets of brands intended for sale exclusively in salons is extensive. In fact, widespread diversion of Jhirmack products was one of the reasons that Jhirmack turned to distribution through OTC channels.

The manner of Playtex's promotion of Jhirmack shampoos shows that Playtex's marketing experts expected that a professional image could be sold outside the salons, and at prices which were relatively high by OTC standards. The salon background, professional quality, and specialized formulation of Jhirmack products are the central themes stressed in Playtex's marketing strategy.

## (3) Distinct Customers

As has been shown above, OTC outlets offer shampoos and conditioners which are not only interchangeable with those sold in salons in terms of ingredients, but which

---

8. Jhirmack's 10–K report to the Securities Exchange Commission for the fiscal year ending April 30, 1978, states

The Company encounters competition in the sale of all its products from a large number of companies, most of which have larger facilities and significantly greater financial resources than the Company. Many of the Company's larger competitors market their products through conventional retail outlets, including drug and department stores, while others market their products through both professional beauty and barber salons and commercial outlets.

also feature the professional formulation and endorsement characteristic of salon products. Customers seeking such characteristics can find them among OTC products. However, evidence tending to show that consumers who patronize salons tend to buy these kinds of products only in salons would support finding a submarket within the broader market. For example, in *Columbia Broadcasting System, Inc. v. F.T.C.*, 414 F.2d 974, 979 (7th Cir. 1969), the court noted that members of record clubs had a distinctive "demand function" setting them apart from consumers who purchased the same kinds of records through other channels of distribution. In *United States v. Grinnell Corp.*, 384 U.S. 563, 574, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1965), the Supreme Court noted, in finding a market composed of accredited central station alarm services, that "some customers will be unwilling to consider anything but central station protection" in choosing alarm systems. *See Knutson v. Daily Review, Inc.*, 548 F.2d 795, 804 (9th Cir. 1976) (submarket analysis should have inquired into whether readers tended to subscribe to both metropolitan and satellite-city newspapers or only one type).

There is testimony tending to support plaintiffs' claim that Jhirmack shampoos and conditioners "appealed to a distinct group of customers, i. e., those persons who frequented salons and were willing to pay a higher price for what they believed to be a superior product because it was endorsed and sold through the salon."

There is also evidence, however, of surveys tending to show that customers who buy shampoo and conditioner at salons also buy them at OTC outlets. Salon customers whose purchases of salon shampoo or conditioner run out between appointments buy more in a "drugstore or supermarket, whichever is convenient."

Other testimony indicates that consumers of hair products, generally, "use many different brands at the same time, varying brands constantly." and that "customers are constantly changing their desires." Shampoo types have short life cycles and in this respect "shampoos have the characteristics of a fashion good." "Brand loyalty is low; interchangeability is high."

Price competition, too, can prompt salon customers to turn to OTC outlets for shampoo and conditioner. The relatively high prices charged by salons caused them to lose sales to OTC outlets. The extensive evidence showing that salons opposed diversion of their brands into OTC outlets and that diversion cut into their sales suggests that many customers switched from buying an exclusive brand in their salons to buying it in OTC outlets instead once it became available there.

Some shampoo and conditioner brands prominent in salons are also regularly sold in OTC channels and the salon prices for these brands are kept low enough to compete with the OTC prices. This reflects an expectation that customers who buy these brands in salons might choose to buy them elsewhere if the price differential between the two channels of distribution were any greater.

While, according to this evidence, there may be customers who generally buy shampoos and conditioners only in salons, there is no substantial evidence establishing the existence or size of such a class. On the other hand there is considerable evidence indicating that many salon customers, for reasons of price or convenience, are willing to purchase these products at OTC outlets.

#### (4) *Prices and Price Sensitivity*

Comparison between the price levels within an alleged submarket and those without, offers some evidence of the degree of cross-elasticity of demand between the two channels. If prices in an alleged submarket are significantly higher than those for otherwise reasonably interchangeable products sold elsewhere, an inference of absence of price competition may arise.

Plaintiffs contend that because shampoos and conditioners are sold at retail in the salon trade at substantially higher prices, and with higher mark-ups, than in OTC outlets, the two channels of trade are not

competitive. Defendants argue that the existence of a substantial price overlap for all shampoos and conditioners, regardless of outlet, refutes that contention.

*Relative price levels*

That the prices of shampoos and conditioners sold in salons are higher as a group than the prices of shampoos and conditioners sold in OTC outlets, as a group, is undisputed. Many salon brands, because of prestige and limited availability, command premium prices.

Plaintiffs showed, moreover, that Jhirmack's sales of shampoo and conditioner increased substantially in the several years preceding its move into the OTC trade at the same time that its products were sold at retail prices much higher than the OTC prices of comparable products or the prices of Jhirmack products diverted to OTC outlets. In *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 713 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), Fotomat's ability to charge distinctive prices while increasing its sales was an important factor supporting the district court's finding of a separate submarket consisting of drive-through photo processing. In appraising the validity of the claim of a submarket consisting generally of shampoos and conditioners which are sold in salons, however, the court needs to look beyond the experience of one firm to that of the trade. The evidence suggests that the salon trade as a whole enjoyed a substantial increase in retail shampoo sales, at least between 1976 and 1980, but does not indicate whether that increase was shared by premium-priced brands or occurred largely among brands sold at lower prices. Thus there is no evidence that the salon trade in general was able to maintain higher retail prices without competitive disadvantage.

A number of the best selling brands in the salon trade are also distributed to OTC outlets on a regular basis. No evidence was presented showing the salon prices of these dually distributed brands. There is no reason to assume that the salon prices for these brands are substantially higher than the OTC prices, and certain evidence suggests that in fact they are not. The testimony establishes that salons could not maintain their price levels for products like Jhirmack if the same product were widely available to the consumer through OTC outlets, and that the salons' ability to charge a premium price for a certain brand depends on limited availability of that brand. Thus one would expect that the wider availability of the dually distributed brands would act as a check on salon prices of those brands. That many salons stopped carrying Jhirmack when it became known that it would be distributed by Playtex in the OTC trade indicates that they expected the competitive price to be substantially lower. A similar drop in the number of salons carrying Vidal Sassoon occurred when its manufacturers pursued distribution in the OTC trade.

Plaintiffs have shown that the salon retail prices of brands manufactured exclusively for salons were substantially higher than prices of the same products sold in OTC outlets through diversion. It appears that when diversion of an exclusive brand like Jhirmack is slight, the limited availability of the product in OTC outlets at substantially lower prices does not impinge on salons' ability to maintain the regular premium price. When diversion of an exclusive brand becomes extensive enough to cut into a salon's sales of that brand, salons tend to discontinue that brand and find another. Thus widespread diversion of an exclusive salon brand provides a competitive check on the salon's ability to sell that brand at a premium price.

*Price range overlap*

A study of price distribution for shampoos at six major types of retail outlets showed that the price ranges at some salons and at some drug, food, and mass merchandise outlets overlap by about half a dollar, approximately a quarter of the OTC price range and a fifth of the salons' price range. Conditioner prices at salons overlap by about six dollars with the price ranges at drug, food, and mass merchandise outlets, approximately three quarters of the OTC

price range and half of the salon price range.

Defendants cite cases rejecting submarkets which rely on evidence of an overlap of prices between products in an alleged submarket and those in the broader market. In *Brown Shoe*, 370 U.S. at 326, 82 S.Ct. at 1524, the Supreme Court affirmed the district court's finding that "medium-priced" shoes competed with "low-priced" shoes, and rejected as "unrealistic" defendant's "contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00." In *United States v. Jos. Schlitz Brewing Co.*, 253 F.Supp. 129 (N.D.Cal.), *aff'd per curiam*, 385 U.S. 37, 87 S.Ct. 240, 17 L.Ed.2d 35 (1966), defendant contended that premium and non-premium beer constituted separate lines of commerce. The district court, observing that beer prices ranged over a wide spectrum, declared that there was "no rational way of choosing a point along this price spectrum and saying that all beer which sells above that point constitutes a line of commerce, or even a sub-market, apart from all beer which sells below that point. This is precisely what the Supreme Court refused to do in *Brown Shoe* . . . ." *Id.* at 145. Nevertheless, even though the price ranges of two sets of products overlap, they may be sufficiently distinct to indicate a lack of significant price competition between the products. *See* P. Areeda and D. Turner, 2 *Antitrust Law* 420 (1978). The existence of a price overlap, therefore, although relevant, is not determinative of the issue of price competition.

Viewing the evidence as a whole, it establishes neither an absence of price competition between salons and OTC outlets nor a lack of sensitivity of salon prices to OTC pricing levels. Although salons are able to charge premium prices for certain brands under conditions of exclusivity and scarcity, their price range overlaps significantly with OTC prices and their competitive behavior is sensitive to that of OTC outlets.

### (5) *Specialized Vendors*

Plaintiffs contend that salons constitute a distinct channel of distribution substantially insulated from the competition of other vendors of shampoo and conditioners because of the salon's ability to provide specialized services to customers and to offer exclusive brands.

Plaintiffs argue that customers are willing to pay premium prices to get a specialized service consisting of personalized advice on what products to buy and how to use them. Hairdressers customarily recommend to their patrons the purchase of certain hair products sold by the salon for home use. These products are often formulated for specific hair types and hair problems. The hairdressers learn how to prescribe the right product in a convincing manner at educational programs conducted by manufacturers of salon products as a major part of their sales effort. In this fashion, manufacturers use the hairdressers as a "sales force."

Some consumers do value a hairdresser's advice regarding selection of hair products for home use and are willing to pay for it. But the evidence is not convincing that they need such advice. Interested consumers are normally able to tell from the advertising and packaging which products to purchase for their own kind of hair or hair problem. Some brands sold in OTC outlets have precisely the same ingredients and uses as those sold in salons, and consumers are capable of making the right selection unaided from among these products.

As heretofore noted, some manufacturers of shampoo and conditioners produce for distribution exclusively within the salon trade. They cater to a strong demand among salons for brands which are distributed exclusively to salons and project an elite professional image. Many salons decline to sell products available in OTC outlets, primarily in order to avoid price competition. Salons are generally unable to maintain premium prices for products widely available at lower prices in OTC outlets.

The exclusive sale of certain brands in a separate channel of distribution may be evidence supporting a finding of a sub-

market, *Cornwell Quality Tools Co. v. C.T.S. Company*, 446 F.2d 825, 830 (9th Cir. 1971), but, as heretofore discussed, the anticompetitive overtones of the salons' conduct rob this evidence of persuasiveness here. Moreover, a considerable portion of the salon trade sells brands of shampoo and conditioner which are distributed to both salons and OTC outlets on a regular basis, including Helene Curtis, LaMaur, Clairol, Wella, and Revlon. Some of these brands are sold by their manufacturers through separate divisions, servicing the salon and the OTC trades respectively. But there is no evidence to indicate that the products differ. It thus appears that, although salons attempt to maintain an aura of distinctiveness, it is more apparent than real.

Analysis of the evidence in the light of *Brown Shoe* indicia, therefore, leads to the conclusion that plaintiffs have failed to prove by a preponderance of the evidence that the salon trade constitutes a distinct submarket for the sale of shampoos and conditioners. *See United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 91 S.Ct. 1692, 29 L.Ed.2d 170 (1971); *Neugebauer v. A. S. Abell Co.*, 474 F.Supp. 1053 (D.Md. 1979). Plaintiffs' case finds no support in the decision in *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir. 1979), on which they rely. There the court upheld the trial court's finding that "drive-thru retail photo processing" constituted a submarket distinct from "photo processing services offered in drug stores, supermarkets, etc." *Id.* at 712. The evidence showed, among other things, that Fotomat's business grew while its prices were 20 to 50 percent higher than drugstore and discount store prices; that the industry regarded drive-thru retail photographic processing as a separate method of doing business; that consumers were willing to pay a premium for the convenience of drive-thru service, and that the Fotomat personnel, unlike drugstore or discount store personnel, were specialists. In affirming the district court, the court of appeals noted that "in defining the relevant submarket the legal 'guidelines offer no precise formula for judgment and [that]

they necessitate, rather than avoid, careful consideration based on the entire record' ...." *Id.* at 714.

■ In the instant case, although there are some differences between the products, prices and services offered at salons and OTC outlets, the extent of competition between these classes of outlets turns primarily on the degree of success experienced by salons in maintaining the exclusive distribution of brands of shampoo and conditioners. The "separateness" of the salon trade, when and where it is found, is largely the result of the salons' efforts to insulate themselves from competition with retail stores by insisting on exclusive distribution of particular brands. That kind of contrived fencing-in of a segment of the market by anti-competitive practices, even if it did not preclude finding a submarket upon proper and sufficient proof, is not acceptable evidence to support such a finding.

■ The Court therefore finds that if the relevant market were to be found at the retail sales level, it would consist of the sale of shampoos and conditioners for home use by both salons and other professional outlets and OTC outlets. As noted above, the available market data permit one to make only the roughest of estimates. The evidence indicates that in that market Jhirmack's share of shampoo sales is less than one percent and its share of conditioner sales approximately two percent.

## IV. THE TYING ARRANGEMENT

Plaintiffs' tying claims attack Jhirmack's new product purchase quota. Jhirmack required each distributor to order a specified quantity of a new product in his next regular order following its introduction. The requirement was limited to a single order. Continued failure to order the specified quantity would result in Jhirmack's refusal to fill further orders of that distributor, and ultimately in cancellation of the distributorship. The *JBL* plaintiffs contend that this policy constituted an unlawful tying arrangement; the *Booth* plaintiffs limit their

claim to the tying of one product, Irene Cologne, to the purchase of Jhirmack's "other beauty care products."

### A. *Section 1—Per Se Violation*

▮ Tying arrangements are presumptively illegal if they meet three conditions:

(1) That the tying arrangement covers two distinct products;

(2) That the defendant has sufficient economic power in the tying market to impose significant restrictions in the tied product market; and

(3) That the amount of commerce in the tied product is not insubstantial.[9]

*Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1212 (9th Cir. 1977).

### 1. *Distinct Products*

▮ Plaintiffs contend that the purchase of new products was tied to the purchase of the so-called Basic Six, a collection of shampoos and conditioners constituting the heart of Jhirmack's product line. Thus distinct products were the subject of the tying arrangement. That the nature of the tied product changed from time to time as new products were introduced is immaterial. *United States v. Loew's Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) (defendants' block booking of motion pictures for television, including a mix of desirable and undesirable pictures in single packages which changed from time to time, held to constitute illegal tying arrangement).

▮ In view of the foregoing conclusion, it is not necessary to decide whether the use of the Jhirmack trademark also constitutes a distinct product, supporting the tying claim. It should be noted, however, that *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 49 (9th Cir. 1971), on which plaintiffs rely, does not support their argument. The court there explained the tying arrangement found in that case as follows:

... [I]t is apparent that the goodwill of the Chicken Delight trademark does not attach to the multitude of separate articles used in the operation of the licensed system or in the production of its end product. It is not what is used, but how it is used and what results that have given the system and its end product their entitlement to trademark protection. It is to the system and the end product that the public looks with the confidence that established goodwill has created.

In the instant case, by way of contrast, the Jhirmack trademark was not separately licensed or franchised but was attached to each of the products sold, serving as an emblem of their origin. *See Siegel*, 448 F.2d at 48. When so used, a trademark cannot be considered a distinct tying product. *Refrigeration Engineering Corp. v. Frick Co.*, 370 F.Supp. 702, 711 (W.D.Tex. 1974); *Mid-America ICEE, Inc. v. John E. Mitchell Co.*, [1973–2] Trade Cas. ¶ 74,681 at 94,986–87 (D.Or.1973).

### 2. *Economic Power*

▮ The Court has heretofore found and concluded that Jhirmack's share of the relevant market did not exceed 5%. On the basis of that finding, it must conclude here that Jhirmack lacked the economic power in the tying market to impose significant restrictions in the tied product market, under *U. S. Steel Corp. v. Fortner Enterprises*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*Fortner II*).

▮ Plaintiffs contend, however, that Jhirmack's products are sufficiently unique to give it "some advantage not shared by its competitors in the market for the tying product." *Id.* at 620, 97 S.Ct. at 867. "Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves." *Id.* at 621, 97 S.Ct. at 868. In *Fortner* the tying product was the "unusual credit bargain" offered by a subsidiary of U. S. Steel to customers of U. S. Steel's prefabricated housing division. There was no evidence that the division,

---

**9.** Inasmuch as Jhirmack distributors purchased over $900,000 of products under the new prod-

uct requirement, the Court finds the amount of commerce to be not insubstantial.

although it was owned by the nation's largest manufacturing company, had any cost advantage over competing finance companies or that it could offer financing significantly different from what other lenders could offer if they so elected. The Court held that "[t]he unusual credit bargain offered to Fortner proves nothing more than a willingness to provide cheap financing in order to sell expensive houses." *Id.* at 622, 97 S.Ct. at 868. Without evidence of some advantage over competitors, the unique character of a product or service does not support a conclusion that the requisite economic power exists.

Plaintiffs contend that the Jhirmack trademark makes the products sufficiently unique to create economic power. They rely on *Chicken Delight*, in which the court held that the "unique registered trademark, in combination with its demonstrated power to impose a tie-in" established market power. 448 F.2d at 49.[10] Even if the Chicken Delight trademark—licensed, unlike Jhirmack's, independently of the product—could have afforded such an advantage,[11] the Jhirmack label attached to a product clearly does not. To infer economic power from the mere existence of a trademark which identifies the origin of the product would render the requirement that the seller have economic power in the relevant market virtually meaningless. The great majority of consumer products are sold under trademarks. The mere use of a trademark does not give a manufacturer an advantage not shared by his competitors whose products are also sold under trademarks, and does not give the economic power in the tying market necessary to have an impact on competition. See *Fortner II*, 429 U.S. at 620, 97 S.Ct. at 867.

Plaintiffs have failed to establish that the Jhirmack trademark afforded its users

some advantage not shared by competitors or that it was otherwise so preeminent that a presumption of economic power is warranted. The alleged power of the Jhirmack trademark is said to derive from its association with Jheri Redding, the founder of Jhirmack, who enjoys "industry-wide recognition and respect." (Plaintiffs' Trial Brief at 36–37). But whatever "uniqueness" derived from Mr. Redding's name has been greatly diluted, if not lost, by the association of his name with the products of at least three other competing manufacturers. Before his association with Jhirmack, Mr. Redding founded and subsequently sold first Jheri Redding Products, Inc., which continues to market products under the name, and then Redken. After he left Jhirmack, Redding's name became and is now associated with the products of his newest company, Nexxus. If plaintiffs' premise were accepted, the Jheri Redding name should now have drawn customers from Jhirmack to Nexxus, greatly diminishing the strength of the Jhirmack trademark.

■ The market for shampoos and conditioners is volatile and highly competitive. There are numerous manufacturers in the market selling a multitude of brands and employing a variety of distribution and marketing techniques. Jhirmack dealt at most with eighty distributors out of hundreds if not thousands throughout the country. Even if a distributorship itself could be considered a tying product, plaintiffs presented no evidence to show that the opportunity to market Jhirmack products was sufficiently unique and desirable to support a presumption that Jhirmack thereby possessed appreciable economic power in the relevant market.

■ The foregoing analysis demonstrates why plaintiffs' *per se* claim must

---

**10.** *It should be noted that the Ninth Circuit in* Moore, *commenting that "the desirability which results from patent or copyright protection constitutes sufficient power for purposes of § 1", neither mentions trademarks nor cites* Chicken Delight. *550 F.2d at 1215–16.*

**11.** *The* Chicken Delight *trademark had been shown to enjoy a unique nationwide preemi-*

nence. *See Cash v. Arctic Circle, Inc.,* 85 F.R.D. 618, 621 (C.D.Wash.1977); *Esposito v. Mister Softee, Inc.,* [1976–2] Trade Cas. ¶ 61,-202 at 70, 478–479 (E.D.N.Y.1976). *See also Krehl v. Baskin Robbins Ice Cream Co.,* 78 F.R.D. 108, 120 (C.D.Cal.1978); *Data General, supra,* [1980–1] Trade Cas. ¶ 63,219 at 78,062.

fail. It is not inappropriate, moreover, to view this dispute from a broader perspective. The reasons for the *per se* illegality rule applied to tying arrangements are summarized in *Moore* —the rule is intended to protect suppliers of competing products, buyers who must forego a choice of products, and the public which is harmed by the adverse effect on the market. A requirement that every distributor submit a one time order for a new product to round out its inventory hardly affects these interests. And certainly the instant arrangement does not create a risk of price discrimination, the principal target of the *per se* rule. *Moore,* 550 F.2d at 1212–13.

### B. *Section 1—Rule of Reason*

Even if some or all of the elements of a *per se* violation are absent, a tying arrangement may be found to violate section 1 under the standard of the rule of reason. *Fortner I,* 394 U.S. 495, 500, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969); *In re Data General Corp. Antitrust Litigation,* [1980–1] Trade Cas. ¶ 63,219 at 78,051 (N.D. Cal.1980). This requires determination of the relevant market and of the seller's share of that market in accordance with the principles which apply to the alleged customer and territorial restraints. *Gough,* 585 F.2d at 389. The analysis in parts III. B. and C. of this opinion, and the disposition of the customer and territorial restraints claim will apply equally to this claim.

### C. *Section 3*

Section 3 of the Clayton Act provides that it shall be unlawful for any person engaged in commerce to make a sale of goods on the condition that the purchaser shall not use or deal in the goods of a competitor, where the effect may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Plaintiffs' Section 3 claim must be rejected.

First, it does not appear that the distributorship agreement or Jhirmack's policy towards its distributors restricted their dealings with other suppliers. Thus an essential element of a Section 3 violation is lacking. *See David R. McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc.,* 504 F.2d 52, 57 (4th Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332, 338 (4th Cir. 1959).

Second, plaintiffs have failed to show that Jhirmack possessed sufficient economic power to threaten the prohibited effect.

Before the decision in *Fortner II,* the mere existence of a tying arrangement coupled with the presence of a not insubstantial amount of commerce was sufficient to create a presumption of the requisite economic power for a violation of Section 3. *Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55 (4th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). The Ninth Circuit has interpreted *Fortner II,* however, as providing "virtually identical" standards for determining whether tying arrangements violate Section 3 and the *per se* prohibition of Section 1 of the Sherman Act. *Moore,* 550 F.2d at 1214. *See Spartan Grain & Mill Co. v. Ayers,* 581 F.2d 419, 428 (5th Cir. 1978); *In re Data General,* [1980–1] Trade Cas. at 78,050.

As heretofore discussed, the finding that Jhirmack's market share did not exceed 5% precludes an inference of sufficient economic power. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–29, 81 S.Ct. 623, 627–29, 5 L.Ed.2d 580 (1961). Nor have plaintiffs shown Jhirmack's products or its trademark to be sufficiently unique to warrant a finding of economic power. See *Fortner II,* 429 U.S. at 619–22, 97 S.Ct. at 867–69. Furthermore, Jhirmack distributors are required to place only a single order for each new product under the quota program; this does not indicate the existence of the kind of leverage at which the tying prohibition is aimed. *Id.* at 617–18, 97 S.Ct. at 866–67. Thus Jhirmack's new product purchase quota could not be found to be a violation of Section 3 of the Clayton Act.

### *Disposition*

Based on the foregoing discussion, findings of fact and conclusions of law, the Court

**380**

A. dismisses plaintiffs' tying claims insofar as they assert a violation of Section 3 or a *per se* violation of Section 1;

B. directs defendants to file motions for summary judgment in all cases directed at the following issues, and such other issues as they may wish to raise:

(1) Whether the *Booth* plaintiffs present a triable issue as to whether they suffered injury cognizable under Section 4 of the Clayton Act;

(2) Whether any plaintiffs present a triable issue as to whether the alleged customer and territorial restraints and the alleged tying arrangements had the requisite impact on competition in the relevant market to violate the rule of reason;

(3) Whether Jhirmack's agreement with Playtex could be found to be a breach of section 1 of the Jhirmack distributors' agreement which grants distributors "an exclusive license . . . within the territory," when that agreement defines "territory" so as to exclude the over-the-counter outlets subject to the Playtex agreement;

(4) Whether, even if the Jhirmack-Playtex agreement were found to be a breach of the distributors' agreement, enforcement of the latter agreement so as to preclude Jhirmack from entering into competing distribution arrangement would be contrary to law and public policy.

Defendants are directed to file their motions and supporting papers by March 20, 1981. Plaintiffs shall respond by April 10, 1981. Reply memoranda may be filed by April 17, 1981. Argument will be heard Friday, April 24, 1981, at 11 a. m.

IT IS SO ORDERED.

EXHIBIT A

PRETRIAL ORDER NO. 1

GOOD CAUSE APPEARING, It is hereby stipulated by the parties and ordered by the Court as follows:

1. *Separate Trial.* Pursuant to Rule 42 of the Federal Rules of Civil Procedure, these actions are hereby consolidated for a separate trial of all issues with respect to (a) The relevant market, (b) Jhirmack Enterprises, Inc.'s share of the relevant market and (c) whether Jhirmack's initial purchase policy constituted a tying arrangement as to any of its products; provided, however, that any issues regarding justification, causation and damages for any alleged tying arrangement shall be reserved for later trial.

2. *Trial by Court.* The issues specified above shall be tried by the Court sitting without a jury. The parties' stipulation to trial of these issues by the Court does not constitute a waiver of their right to a jury trial with respect to other issues.

3. *Discovery Schedule.* All discovery on the issues specified above shall be completed and all responses to interrogatories and other requests regarding the issues specified above shall be served and filed by August 15, 1980.

4. *First Pretrial Conference.* The first pretrial conference shall be held on August 15, 1980, at 3:00 p. m.

5. *Exchange of Exhibits and Pretrial Statements.* By September 5, 1980, counsel shall designate excerpts of depositions and exchange copies of all proposed statements of each party's witnesses, exhibits to be offered and all schedules, summaries, diagrams and charts to be used at trial other than for impeachment or rebuttal. By September 5, 1980, counsel shall also exchange and file pretrial statements and trial briefs. The provisions of Local Rules 235–6 and 235–7 shall apply as appropriate.

6. *Final Pretrial Conference.* The final pretrial conference shall be held on September 12, 1980, at 3:00 p. m.

7. *Trial Date.* Trial of the issues specified above shall commence on September 22, 1980, at 9:30 a. m.